## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **MADELINE MALDONADO, ABRAHAM VALENCIA** individually and on behalf of their minor children **ALEX MALDONADO VALENCIA, EDGAR MALDONADO VALENCIA and CHRISTIAN MALDONADO VALENCIA;** | CIV. NO. 07-1992 JAG |
| | DEMAND FOR JURY TRIAL |

**CARMEN VAZQUEZ** Individually and on behalf of her minor children **DEREK CRUZ** and **ALEX JOEL VAZQUEZ;**

**MARIA RIOS COLON** Individually and on behalf of her minor children **CARLOS DAVID COLON, LEONIEL MELENDEZ,** and **JESUS MELENDEZ;**

**RUTH VIDOT** Individually and on behalf of her children **JAHAIRA SANTANA, LUISA MARIA SANTANA, MARIA LUISA SANTANA, GRACE SANTANA, VIRGEN RIVERA,** and **MARIA DAHLIA RIVERA;**

**LUZ RODRIGUEZ** Individually and on behalf of her minor children **JUDY ANGELIE;**

**MAYRA VALLE** Individually and on behalf of her minor children **THALIA PEREZ VALLE** and **ENID PEREZ;**

**JENNIFER JIMENEZ** Individually and on behalf of her minor children **JANICE TORRES** and **JOEDNIEL TORRES;**

**MARIYUNAIRA RIVERA** Individually and on behalf of her minor child **VICTOR MANUEL NEGRO;**

**RAFET CANDELARIA;**

**JOHANNA GONZALEZ;** Individually and on behalf of her minor child **JOSE E. DE JESUS, MARIA DE LOURDES DE JESUS** and

**JOSE D. DE JESUS AND AGUEDA SERRANO**

**ELVIA TIRADO;**

**CARMEN VALLE;**

**MARIBEL RIVERA VARELA** Individually and on behalf of her minor child **KEYSHA** and **NAYSHA RIVERA;**

**ANTONIA MORALES;** Individually and on behalf of her minor children **KELVIN** and **RANDY MORALES;**

**JUDITH VARELA** Individually and on behalf of her minor child **JOHAMED RIVERA, JULIAN LOPEZ RIVERA** and **ASHELY RIVERA;**

**SONIA KORTRIGHT SANCHEZ;**

**DAISY CABALLERO CRUZ** Individually and on behalf of her minor children **WILFREDO DE LEON CABALLERO, ADNERSY RODRIGUEZ CABALLERO, RAFAEL J. RODRIGUEZ CABALLERO** and **MELQUISEDEC MAISONET CABALLERO;**

**JACQUELINE SANTIAGO** Individually and on behalf of her minor child **KIARA RODRIGUEZ SANTIAGO;**

**ANGEL RAFAEL SIERRA, EVELYN VAZQUEZ** Individually and on behalf of their minor children **ANGELICA, KARINA, SORIMAR, CHRISTOPHER, NEYSHA, MIGUEL ANGEL;**

**RAMONA OJEDA GONZALEZ;**

**ANGELICA VALLE** Individually and on behalf of her minor children **ELBI MOLINA**

2

**KELVIN MOLINA** and **IDALY MOLINA;**

**OMAR RODRIGUEZ**;

**ANDREA RODRIGUEZ OTERO** and **FELIX DE LEON** and the marital estate between them;

**EVELYN SOLER DAVILA;**

**VANESSA GUTIERREZ** Individually and on behalf of her minor children **STEPHANIE MOYA** and **KENNETH ESCOBAR;**

**CARMEN LUZ AGOSTO ROMAN** Individually and on behalf of her minor children **PRISCILLA HOWARD, JOHN HOWARD, EDWIN HOWARD** and **JOSHUA LAMOUTTE;**

**EVELYN TALAVERA** Individually and on behalf of her minor children **HECTOR LAUREANO and LUIS LAUREANO;**

**ROSA RODRIGUEZ MARIN** Individually and on behalf of her minor children **BRYAN CORTES, VIRGINIA CORTES** and **ROSA CORTES;**

**BLANCA MEDINA** Individually and on behalf of her minor child **CARLA MICHELLE COLON;**

**ELBA IRIS GUZMAN REYES;**

**LIZETTE AGOSTO** Individually and on behalf of her minor child **BYRON CANCEL**;

**JOSE RODRIGUEZ MARIN JESSICA FUENTES** individually and on behalf of their minor children **DAVID FUENTES and JOSE E. RODRIGUEZ FUENTES**

**Plaintiffs.**

3

**Vs.**

**MUNICIPALITY OF BARCELONETA;**

**SOL LUIS FONTANES, Mayor of Barceloneta** in his personal and official capacities and **ELSA PEREZ** the spouse of **Sol Luis Fontanes** and the conjugal partnership between them;

**CARLOS LABOY**, Chief of the Public Housing Administration of Department of Housing of the Commonwealth of Puerto Rico, is sued in his **official capacity only;**

**SYLVIA RIQUELME,** Administrator of a public housing community in the **Municipality of Barceloneta** in her personal and official capacities and **"JOE PUBLIC"** the spouse of **Sylvia Riquelme** and the conjugal partnership between them;

**LEONIDES GONZALEZ,** Administrator of a public housing community in the **Municipality of Barceloneta** in her personal and official capacities and **"JOE PUBLIC"** the spouse of **Leonides Gonzalez** and the conjugal partnership between them;

**ESTHER RUIZ** Chief of the Housing Project Division of the **Municipality of Barceloneta** in her personal and official capacities **"JOHN PUBLIC"** the spouse of **Esther Ruiz** and the conjugal partnership between;

**AMID MOLINA MORALES,** Chief of the Civil Defense Division of the **Municipality of Barceloneta** in her personal and official capacities and **"JOE PUBLIC"** the spouse of **AMID MOLINA MORALES** and the conjugal partnership between tem;

**EDGARDO SANTIAGO**, employee of the **Municipality of Barceloneta** in his personal

4

and official capacities and **"JANE PUBLIC"** the spouse of **EDGARDO SANTIAGO** and the conjugal partnership between them;

**JULIO DIAZ;** President of Animal Control Solutions, Inc., and Contractor of the **Municipality of Barceloneta** sued in his personal and official capacities and **"JANE PUBLIC"** the spouse of **JULIO DIAZ** and the conjugal partnership between them;

**ANIMAL CONTROL SOLUTIONS, INC**

**JOHN DOE II AND JANE DOE, ET. AL;** fictitious names of other persons who directly participated in the planning or execution of the relevant facts of violation of rights of Plaintiffs**.**

**INSURANCE CO., ABC, ET. AL.**

       **Defendants.**

## SECOND AMENDED COMPLAINT

TO THE HONORABLE COURT:

Come now the Plaintiffs, by and through their undersigned attorneys, Pedro R Vazquez and Maria S. Kortright Soler and on their behalf, state, allege, and requests as follows:

## I.    NATURE OF ACTION

1.1    This is an action for injunctive, declaratory and compensatory relief as a result of Defendants' violation of Plaintiffs' Constitutional, State and Federally protected rights.  Plaintiffs have property rights in their pets and reasonable expectations to be safe and secure from having the City Government of Barceloneta from executing law enforcement type raids where their homes were illegally invaded and their pets illegally and without warrants, taken from them without affording *pre-*

*deprivation* or *post deprivation* remedies prior or after the taking of their pets.

1.2     On or about October 1, 2007,  the Municipality of Barceloneta acquired the right to operate and manage the public housing communities by transfer of such right from the Puerto Rico Housing Administration. Defendants Sol Luis Fontanes, Sylvia Riquelme and the other defendants which are high ranking officials of the Municipality of Barceloneta established a policy whereby residents would be forced to surrender their pets.

1.3     On October 8, 2007, without any previous legal or administrative process where the Plaintiffs could establish their legal positions and an opportunity to defend their property and liberty rights, all Defendants, acting under color of law and of authority and in concert and conspiring among and between each other, conducted law enforcement control type raids in three different public housing communities within the jurisdiction of the Municipality of Barceloneta with the purpose of depriving the residents of their pets.  The Mayor himself and other high ranking municipal officers were present and backed by a force of uniformed employees, officers of the municipal police and other employees and also backed by unidentified employees of a private contractor, Animal Control Solutions Inc.  Together they executed these raids and demanded that Plaintiffs hand over their pets or face eviction; otherwise they faced the ominous specter of becoming homeless.  Defendants' intent was to violate Plaintiffs' civil rights by conducting illegal warrantless searches and seizures and the illegal confiscations of their pets.

1.4     Plaintiffs had to witness Defendants removing, mistreating, injecting and/or administering their pets - small dogs and cats - with unknown chemicals, then slamming them against vehicle panels in which they were to be transported.

1.5     The family pets that survived the initial brutality were thrown from a bridge commonly known as "El Paseo del Indio" in northwest Puerto Rico approximately 50 to 60 feet to their deaths.

1.6    Defendants, consolidated and confirmed their policy and practice as Managers of the Public Housing communities of Barceloneta by repeating the process just two days later, on Wednesday October 10, 2007, of what has been Defendants  custom, practice and policy of systemic civil rights violations against the residents, pursuant to the Mayor's orders and an alleged municipal ordinance banning pets.  Again, Defendants went to Plaintiffs' residences and in threatening and demanding demeanor with officers dressed in uniforms demanded the immediate surrender of their pets or face the inevitable: eviction and becoming homeless.

1.7    On October 10, 2007, Plaintiffs' again suffered and  witnessed Defendants' custom and policy at work: the removal by coercion and intimidation of their pets and the administering  of unknown chemicals into the little animals, slamming them against vehicle panels only to find out later that  the ones who had survived the initial brutality had been hurled to their death from a bridge commonly known as "El Paseo del Indio" approximately 50 to 60 feet.  A few pets survived.

1.8    Indeed, Defendants' conduct is shocking to the conscience of ordinary and reasonable men and women; even of the more hardened individuals.  In fact, the Defendants conduct and their callous and reckless disregard for the Plaintiffs' Fourth and Fourteenth Amendment rights and the subsequent brutality against their pets, culminating in plunging them to their deaths shows a cold and depraved heart and has stirred the public outrage around the whole world.

1.9    A declaratory judgment and permanent injunction will protect the Plaintiffs from  the Defendants' custom, ordinance, policy and practice of systematic civil rights violations and to ensure that the Plaintiffs are afforded fundamental rights of life, liberty and property, pre-deprivation and post-deprivation remedies, the compliance of due process requirements and to prevent such wanton cruelty to Plaintiffs and their pets.  The injunctive relief is also to prevent Defendants from taking

reprisals against Plaintiffs for the exercise of seeking redress for their injuries.

1.10     Plaintiffs also request compensatory damages, punitive damages and a judgment ruling upon their rights under the Constitution and Laws of Puerto Rico where such affords them a right to their privacy, dignity, happiness and equal protection of the law; the general tort statute penalizes the conduct engaged in by Defendants and where State laws prohibit the manners in which the defenseless pets were treated and the pain inflicted upon the Plaintiffs.

1.11     Upon information and belief, these law enforcement type raids for the purpose of pet-confiscation have been conducted only against residents of public housing communities; thus, they have not occurred in private subdivisions or more affluent neighborhoods.  Defendants' custom and policy of deprivation of civil rights and the actions in furtherance of the their conspiracy to violate the Plaintiffs' civil rights has been limited to members of public housing communities.  As such, the Defendants' violation of Plaintiffs' civil rights demonstrates an invidious discriminatory animus against members of public housing communities where through their actions, Plaintiffs were reminded of their subordinated and disadvantaged economic and social conditions.

1.12     Defendants' actions violate the Plaintiffs' rights under the Fifth Amendment of the Constitution of the United States as applied to the States under the Due Process Clause (substantive and procedural)  of the Fourteenth Amendment of the Constitution of the United States as well as the laws of the Commonwealth of Puerto Rico.  Such actions, described herein are without justification, illegal, unreasonable, arbitrary, and an oppressive abusive use of power by Defendants acting under color of law and authority.

## II.     JURISDICTION AND VENUE

2.1     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that the claims involve Federal Question jurisdiction.

2.2     This Court has subject matter jurisdiction pursuant to the Fourth, Fifth and Fourteenth Amendment of the United States Constitution.  42. U.S.C. § 1983; 42 U.S.C. §§1985 and 1986 .

2.3     This Court has subject matter jurisdiction pursuant to the supplemental jurisdiction statute (28 U.S.C. § 1367) to hear and decide a cause of action based on violations of the Commonwealth of Puerto Rico's law namely:    The Constitution of Puerto Rico, Sections *One* (Human dignity and equality; discrimination prohibited), *Four* (Freedom of speech and press; peaceful assembly; petition for redress of grievances), *Seven* (Right to life, liberty, and enjoyment of property; no death penalty; due process; equal protection of laws; impairment of contracts; exemption of property from attachment), *Eight* (Protection against attacks on honor, reputation, and private life), *Nine* (Just compensation for private property) and *Ten* (Searches and seizures; wire-tapping; warrants; Articles 1802 and 1803 of Civil Code; [31 LPRA § 5141 and 5142]; and 5 L.P.R.A. § 1652 (Acts of cruelty generally) and Law 67 of 1973 for the protection of animals.

2.4     Venue is proper in the instant case as all claims arise from events that have occurred and are occurring within the jurisdiction of this Court in the Commonwealth of Puerto Rico.

2.5     Pursuant to Federal Rule 65 (b) of the rules Civil Procedure, the Court has jurisdiction to issue a Permanent Injunction.

2.6     Plaintiffs request a trial by jury.

### III.     PARTIES TO THE ACTION

3.1     Adult Plaintiffs named and identified in the caption to this Complaint and in the statement of facts of this Complaint  are residents of  public housing communities in the jurisdiction of the Municipality of Barceloneta of the Commonwealth of Puerto Rico.  *Infra*.

3.2     Minor plaintiffs identified in the caption to this Complaint and in the statement of facts of this Complaint are the children of the adult plaintiffs.  *Infra*.

9

3.3    The **Municipality of Barceloneta** is a legal entity created by the Commonwealth of Puerto Rico's Legislature with the power to sue and be sued and is a "person" under the definition of such for purposes of violations to the Civil Rights Act.  21 L.P.R.A. § 4051.

3.4    **Sol  Luis Fontanes**: is the Mayor of the Municipality of Barceloneta and is being sued in his personal and official capacity.  His intentional and  illegal acts were done within the scope of his work, under color of  law and as such, is responsible for the illegal actions and damages inflicted upon Plaintiffs.  **"ELSA PEREZ"** is the unknown spouse of **Sol  Luis Fontanes** and the conjugal partnership between and as co-administrator of the marital estate.

3.5    **Carlos Laboy:** is the Chief of the Public Housing Administration (PHA) (Administracion de Vivienda Publica) of the Commonwealth of Puerto Rico.  Mr. Laboy is sued in his **official capacity only** for purposes of the implementation of injunctive relief.

3.6    **Sylvia Riquelme**: is the Administrator of a public housing community in the Municipality of Barceloneta who is being sued in her personal and official capacities.  Her intentional and  illegal acts were done within the scope of her work, under color of law and as such, is responsible for the illegal actions and damages inflicted upon Plaintiffs.  **"JOE PUBLIC"** the unknown spouse of **Sylvia Riquelme** and the conjugal partnership between and as co-administrator of the marital estate.

3.7    **Leonides Gonzalez**: is the Administrator of a public housing community in the Municipality of Barceloneta who is being sued in her personal and official capacities.  Her intentional and  illegal acts were done within the scope of his work, under color of law and as such, is responsible for the illegal actions and damages inflicted upon Plaintiffs.  **"JOE PUBLIC"** the unknown spouse of **Leonides Gonzalez** and the conjugal partnership between and as co-administrator of the marital estate.

10

3.8     **Esther Ruiz,** is the Chief of the housing division or the federal programs division, under which the housing policies are planned and executed and is being sued in her personal and official capacities.  Her intentional illegal acts were done within the scope of his work, under color of law and, as such, is responsible for the illegal actions and damages inflicted upon Plaintiffs.  "**JOE PUBLIC"** is the unknown spouse **Esther Ruiz,** and the conjugal partnership between and as co-administrator of the marital estate.

3.9     **Amid Molina Morales;** is the Chief of the Civil Defense Division of the Municipality Of  Barceloneta and is being sued in his personal and official capacities.  He directly planned, supervised and executed all of the intentional illegal acts against the Plaintiffs.  His participation in the planning and execution of the raids and taking of property of the residents without due process were done within the scope of his work, under color of law and as such, is responsible for the illegal actions and damages inflicted upon Plaintiffs.  **"JOE PUBLIC"** the unknown spouse of **Amid Molina Morales** and the conjugal partnership between and as co-administrator of the marital estate.

3.10     **Edgardo Santiago**, also known as "Nino" is an employee of the **Municipality of Barceloneta** sued in his personal and official capacities.  He directly planned, supervised and executed all of the intentional illegal acts against the Plaintiffs.  His participation in the planning and execution of the raids and taking of property of the residents without due process were done within the scope of his work, under color of law and as such, is responsible for the illegal actions and damages inflicted upon Plaintiffs.  **"JANE PUBLIC"** the unknown spouse of **Edgardo Santiago** and the conjugal partnership between and as co-administrator of the marital estate.

3.11     **Julio Diaz:** is the President of Animal Control Solutions, Inc., and contractor and agent of the Municipality of Barceloneta  who  is sued in his personal and official capacities for his actions and omissions in the training, support, encouragement and supervision of employees who were

involved and participated in the law enforcement type raids conducted in the municipality of Barceloneta acting in concert with the other named Defendants. Such actions complained of herein, are of a governmental nature under the police power of the Defendants Barceloneta and Fontanes. His intentional actions and omissions were done within the scope of his work for the municipality of Barceloneta, totally intertwined with government action and vested with government authority under color of law and as such, is responsible for the illegal actions and damages inflicted upon Plaintiffs. "**JANE PUBLIC**" is the unknown spouse **Julio Diaz,** and the conjugal partnership and as co-administrator of the marital estate.

3.12    **Animal Control Solutions, Inc ("ACS):** upon information and belief, this company is a closely held corporation owned wholly or in part by Defendant **Julio Diaz. Animal Control Solutions, Inc,** through Mr. Diaz, undertook to execute intentional and illegal acts that were done within the scope of work of this entity for the Municipality of Barceloneta. The relevant acts executed by ACS which form the basis of the present claims were actions totally intertwined with governmental action under the police power of the Municipality and vested with government authority under color of law. ACS is responsible for the illegal actions and damages inflicted upon Plaintiffs.

3.13    **John Doe II And Jane Doe, et. al.:** are fictitious names for those individuals as yet unknown, who, together with the named Defendants participated in or acted in concert to carry out the acts complained of herein and who also acted intentionally, illegally and under color of law under the police power of the Municipality of Barceloneta and which caused damages to Plaintiff.

3.14    **Insurance agencies A, B, and C** are companies which may be providing insurance to the above Defendants which may cover their liability for the violation of the Plaintiffs Federally protected rights, and whose names are heretofore unknown.

**IV.    FACTS COMMON TO ALL PLAINTIFFS AND CAUSES OF ACTION**

4.1      All of the herein named Defendants are persons, legal or natural, subject to civil rights statutes and law.

4.2      All Plaintiffs are residents of the public housing communities in Barceloneta, namely, Residencial Plazuela ("Plazuela"), Residencial Antonio Davila Freytes ("Freytes") and/or Residencial Quintas de Barceloneta ("Quintas").

4.3      The Municipality of Barceloneta ("Barceloneta") is a legal entity created by the Commonwealth of Puerto Rico's legislature with the power to sue and be sued.

4.4      Barceloneta is a "person" subject to the provisions of the federal Civil Rights Act.

4.5      Defendant Sol Luis Fontanes ("Fontanes") is the Mayor of the Municipality of Barceloneta and  Chief Executive Officer of the mentioned entity and a "person" subject to the provisions of the federal Civil Rights Act.

4.6      Fontanes  is responsible for the day-to-day operations of Barceloneta.

4.7      Fontanes supervises and/or supervised, either directly or indirectly, the housing operations, the municipal police department, the municipal civil defense division, the municipal emergency responses and the like.

4.8      Fontanes planned, personally participated and executed, in concert with his employees, the raids within the public housing projects in Barceloneta which resulted in the loss of the residents' defenseless animals, property and rights, intentionally creating a coercive environment and preventing the residents to know and exercise their rights.

4.9      Mayor Fontanes' personal involvement and participation in the events described herein, related to the pet-raid occurring on October 8, 2007 and repeated on October 10, 2007, was done under color of law and with the intention of depriving the residents of their constitutional rights

13

and property without due process.

4.10    **Sylvia Riquelme** is the Administrator of the Residencial Plazuela of the Municipality of Barceloneta**.**

4.11    Upon information and belief Ms. Riquelme is responsible for the day-to-day operation of the mentioned housing community in Barceloneta and she reports directly to the mayor, Sol Luis Fontanes.

4.12    Upon information and belief Ms. Riquelme participated actively and acted in concert with the other named Defendants in the planning and execution of the events that led to violations claimed in this Complaint.

4.13    Ms. Riquelme's actions and involvement in the raid were done under color of law in order to intentionally deprive the residents of their constitutional rights and property.

4.14    **Leonides Gonzalez** is the Administrator of the Residencial Quintas de Barceloneta/Hector Ruiz of the Municipality of Barceloneta**.**

4.15    Upon information and belief Ms. Gonzalez is responsible for the day-to-day operation of the mentioned housing community in Barceloneta and she reports directly to the mayor, Sol Luis Fontanes.

4.16    Upon information and belief Ms. Gonzalez participated actively and acted in concert with the other named Defendants in the planning and execution of the events that led to violations claimed in this Complaint.

4.17    Ms. Gonzalez's actions and involvement in the raid were done under color of law in order to intentionally deprive the residents of their constitutional rights and property.

4.18    Upon information and belief, **Esther Ruiz,** is the Chief of the organizational unit of the Municipality where the housing policies of public housing are made and /or executed.

4.19    Esther Ruiz acted pursuant to municipal ordinance and/or policy that purportedly prohibited pets within the territorial jurisdiction of the municipality of Barceloneta as well as the public housing communities that they administered.

4.20    Esther Ruiz is responsible for the day-to-day management of the housing operations and is supervised by the Mayor.

4.21    Upon information and belief  Esther Ruiz planned and executed the raids of October 8, 2007 and October 10, 2007 in the public housing communities.  And on information and belief Ms. Ruiz participated, executed and/or planned and directed the police-type operation during the raids of October 8, 2007 and October 10, 2007, in all three of the public housing communities.  Acting in concert with the other defendants deprived Plaintiffs of their Constitutional rights while acting under color of law and pursuant to the policy and/or ordinance of the Municipality of Barceloneta.

4.22    John Doe I's actions and involvement and acting in concert with the other named Defendants in such raids were intentional and illegal and destined to deprive the residents of their property and constitutional rights and done under color of law.

4.23    Upon information and belief the Civil Defense Division of the Municipality of Barceloneta is a governmental subunit that is responsible for the day-to-day management of any areas related to emergency, safety and/or security and is supervised by the city administrator and/or the Mayor.

4.24    Upon information and belief, **Amid Molina Morales, ("Molina")** is the Chief of the Civil Defense Division of the Municipality  responsible for the day-to-day management of the Civil Defense Division and is supervised by the Mayor.

4.25    Upon information and belief Molina directed the police-type operation during the raids of October 8, 2007 and October 10, 2007, and acting in concert with the other defendants

deprived Plaintiffs of their Constitutional rights while acting under color of law and pursuant to the policy and/or ordinance of the Municipality of Barceloneta.

4.26    **Edgardo Santiago**, also known as "Nino" is an employee of the Municipality of Barceloneta.

4.27    Upon information and belief Santiago participated, executed and/or planned and directed the police-type operation during the raids of October 8, 2007 and October 10, 2007, in all three of the public housing communities and acting in concert with the other defendants deprived Plaintiffs of their Constitutional rights while acting under color of law and pursuant to the policy and/or ordinance of the Municipality of Barceloneta.

4.28    John Doe II and Jane Doe are municipal employees who actively participated and acting in concert with the other named Defendants in the planning and execution of the raids executed by defendants on October 8 and 10, 2007 and done under color of law and with the intentional and illegal objective of depriving the residents of Barceloneta's public housing communities to have, keep and care for animals and also directed at preventing them from exercising any rights, procedural and substantive, they could have raised.

4.29    **Carlos Laboy** is the Chief of Public Housing Administration ("PHA") which transferred the administration of the public housing communities to Barceloneta.

4.30    The PHA has within its scope of functions the authority to investigate and audit municipal housing operations.

4.31    The PHA has a duty to oversee that the administrators be certified, trained and comply with federal housing policies and it also has the obligation to ensure that constitutional rights and statutes of the United States are enforced according to the law of the land.

4.32    **Animal Control Solution, Inc**. (ACS), is a corporation that was contracted by the

16

Municipality of Barceloneta with the purpose of picking up and controlling the stray animal population of the Municipality.  Upon information and belief, ACS's personnel, with the support, encouragement, acquiescence and under the direct orders of its President, Julio Diaz, actively participated in the events that give rise to this complaint including the massacre of the Plaintiffs' pets, cloaked with the police power of the State and under color of law of the municipal officials with they acted closely and in concert with the other named Defendants.

4.33    Julio Diaz is the President of ACS.  Upon information and belief, this company is a closely held corporation owned wholly by Diaz, who either directly or indirectly participated with the ACS in the events that give rise to this complaint while cloaked with the police power of the state and under color of law of the municipal officials with which they acted closely and in concert with, namely, the other named Defendants.

4.34    On October 1, 2007, the Municipality of Barceloneta assumed the control, responsibilities and obligations of the day-to-day operations of three public housing communities in Barceloneta.  These were: (1) Plazuela public housing community, (2) Antonio Davila public housing community and (3) Residencial Hector Ruiz, also known as Residencial Quintas de Barceloneta.

4.35    Upon information and belief before the assumption of such control, Barceloneta received training and information in order to qualify as a public housing administrator.

4.36    On October 2, 2007, the first order of business was to devise a plan to deprive the residents of the public housing communities of their domestic pets, mostly dogs and cats kept in the homes.

4.37    Barceloneta sent residents a memorandum or communique addressed to "All Residents" of public housing, informing that the municipality was aware of families that owned dogs and cats and that they had hired ACS for the "pick-up" of the animals and that such should be

"voluntarily" removed or face eviction.  Attached to the memorandum was a purported regulation from the Puerto Rico PHA regarding pet policies written in English; however, the residents are predominantly Spanish speaking and with few exceptions they do not speak, read or write English.

4.38    The memorandum was devoid of any right to challenge the proposed action, informing of any pre-deprivation or post deprivation remedy; of where the pets could be picked up.  Nor did the memorandum provide a reasonable period of time to make alternate arrangements for Plaintiffs to find homes for their pets.

4.39    These notices were delivered to the residents between October 3 and 7 of 2007.

4.40    On Monday, October 8, 2007, ACS and municipal  personnel arrived at the Plazuela public housing community.  Present were Sylvia Riquelme, the Administrator of the public housing community, Mayor Sol Luis Fontanes, as well as other uniformed employees of the Municipality of Barceloneta apparently ascribed to the Civil Defense Division of the Municipality.  Upon information and belief, Carlos Laboy did not participate in this process.

4.41    On Monday, October 8, 2007, ACS and municipal personnel also arrived at the Antonio Davila public housing community.   Present were employees of the Municipality of Barceloneta, as well as other uniformed employees of the Municipality and employees of ACS.  Upon information and belief, Carlos Laboy did not participate in this process.

4.42    On Monday, October 8, 2007, ACS and municipal personnel also arrived at the Hector Ruiz public housing community.  Upon information and belief, Carlos Laboy did not participate in this process.

4.43    On the mentioned date and before the residents had an opportunity to respond, Defendants and ACS carried out a surprise law enforcement operation similar to those conducted by Police in narcotics interdiction raids.  The residents of each housing community awoke on Monday,

18

October 8, 2007, to find a detachment of municipal employees from the police force, the civil defense, other municipal employees, employees of ACS, the Mayor himself and the rest of defendants, except for Laboy, going from house-to-house instructing the residents to hand over their pets or eviction proceedings would begin immediately.

4.44    During this process, of going house-to-house instructing the residents to hand over their pets, at times the Defendants would grab the pets, without distinction of the type of pet, whether the pet was identified as having ownership or not, marked with a collar and identified as belonging to someone, whether the pet was roaming the streets as a stray or in the premises of individual housing units; they even if took them away from defenseless children without their parent's presence. Defendants opened doors to laundry areas within the homes, took pets from children whose parents were not present, threatened residents to hand over their pets or face eviction, took pets whose owners were not present by going in to the enclosed patio within the zone of safety of the plaintiffs' home in the laundry areas and took possession of the animals and other similar actions.

4.45    While the raids were going on, children watched the brutality; pets soiled themselves out of sheer fear and trauma, people screamed or cried and watched as Defendants including employees of ACS,  grabbed the pets with an instrument described as a stick with a metal ring at the end (also known as a "catch-pole"), they would catch the animal by the neck, pull on the string, choke the pet and slam the animal inside a van.  Even pregnant animals of very small size were brutalized.

4.46    In the presence of Plaintiffs and their children  and others, some animals were injected and/or administered with an unknown substance by the employees of Julio Diaz and ACS; the workers said the purpose was to tranquilize the animal.

4.47    Some witnesses and/or Plaintiffs concluded some pets were killed in their presence.

4.48    During these raids there was no veterinary present in the housing communities.

19

4.49    Pleas and warnings from Plaintiffs including witnesses and/ or residents requesting time to challenge the actions were ignored and rejected by Defendants who culminated their cruelty by driving away with the confiscated pets as if nothing had happened.

4.50    The foregoing scenario was repeated in every housing community and again in October 10, 2007.

4.51    On Wednesday, October 10, 2007, Defendants repeated the process in the three public housing communities.  Upon information and belief, Carlos Laboy did not participate in this process.

4.52    Again the community was raided and pets were taken away in the same circumstances and without any regard for the Plaintiffs' rights or their pleas.

4.53    Defendants' have acted knowingly, intentionally, willfully, wantonly and/or with reckless disregard for Plaintiffs' Federal and State rights.  Indeed, such actions and omissions by the Defendants shock the conscience.

4.54    All of the Defendants actions were taken pursuant to an alleged municipal ordinance banning pet ownership in effect years prior.  In fact, it was the Municipality of Barceloneta's housing policy to take away the pets which they implemented immediately upon taking the administration of the public housing facilities in Barceloneta.  Such policy was executed by the Defendants without any regards for fundamental rights and fairness, namely, notice and due process of law prior to taking the proposed action or, any  after-action remedy to object or challenge the government's conduct in a meaningful manner.

4.55    Before October 1, 2007, the residents and Plaintiffs had their pets with the knowledge and consent of the housing administrators and there was no prohibition of the type of pets which were illegally and intentionally removed and killed by Defendants.

4.56    Defendants made a show of force and coercion, knocking on doors, entering the home

premises in the laundry area or snatching pets from owners, at times from children, while threatening them with eviction if the pets were not surrendered to the government authorities and/or their agents executing the raid.

4.57    Plaintiffs later learned that their precious pets had been hurled off a 50 or 60 foot bridge to their deaths in an area known as Paseo del Indio.

4.58    All of the Defendants actions and/or omissions were done with the intent of depriving the Plaintiffs of their liberty and property and with the intention of violating their rights guaranteed by the US and the Commonwealth's Constitutions.

4.59    Defendants acted with the intent of killing the pets, whether such acts were by hurling the pets from a bridge or by injecting or administering them with chemicals.  At any rate, all Defendants acted with the intent to deprive the Plaintiffs' of their pets and of killing them without their valid consent and authorization and knowingly participating in a raid that was patently illegal to any observer.  Defendant ACS and its employees, including Mr. Julio Diaz were cloaked with the police power of the State and under color of law of the municipal officials with which they acted closely and in concert with.

4.60    Defendants ACS, Julio Diaz nor any of its employees, had the authorization of any Plaintiff to take their property; they acted in concert and as an extension of the government's police power of the municipality, or otherwise.

4.61    The Defendants failure and refusal to provide the Plaintiffs with a *pre-deprivation* remedy prior to taking the adverse action complained of herein violated their  protected rights under the Fourteenth Amendment of the U.S. Constitution, namely guaranteeing them the right to some form of hearing before the proposed actions were to be taken; the confiscation of their pet.  As such the Defendants intentional actions constitutes a violation of their property rights secured under 42 U.S.C.

21

§ 1983 and the the US and the Commonwealth Constitutions, namely, due process of law.

4.62    Defendants failure and refusal to provide the Plaintiffs with a *post-deprivation* remedy after taking the adverse action complained of herein violated their protected rights under the Fourteenth Amendment of the U.S. Constitution, namely guaranteeing them the right to some form of hearing after the actions were to be taken; the confiscation of their pet.  As such, the Defendants intentional actions constitutes a violation of their property rights secured under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, namely, due process of law.

4.63    Defendants' actions and omissions where they illegally, arbitrarily and in a capricious manner confiscated and later killed Plaintiffs' pets was in violation of the their fundamental rights guaranteed and secured under the Fifth and Fourteenth Amendment.  Such actions caused an irreversible and irrevocable loss and effect to Plaintiffs'  - and their children - Constitutional rights of being able to enjoy their life, liberty, property and happiness in their homes and in their pets as secured and guaranteed by the Due Process Clause (substantive) of the Fifth and Fourteenth Amendment of the Constitution of the United States as well as the laws of the Commonwealth of Puerto Rico.

4.64    Defendants failure and refusal to obtain a properly authorized search warrant describing with particularity the place to be searched and the items to be seized - the pet(s) - supported by a sworn affidavit violated the Plaintiffs' Fourth Amendment rights of the U.S. Constitution *prior* to taking the pet(s); the right to be free from unreasonable searches and seizure.  As such Defendants intentional actions and omissions constitutes a violation of their rights to be free from illegal and unreasonable searches and seizures of their property secured under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendment of the United States Constitution as incorporated through the due process clause.

4.65    All of the Plaintiffs have suffered greatly due to the deprivation of their beloved pets without any due process, the violent and inhumane manner in which the raids were conducted, the loss of privacy and dignity individually and collectively and the emotional impact upon learning that their pets had undergone a violent, cruel and illegal death when Defendants hurled the pets from a bridge causing their death or, in some cases broken backs or legs.

4.66    Defendants' actions and omissions in the manner in which they illegally, arbitrarily and in a capricious manner confiscated and later killed Plaintiffs' pets violated the Plaintiffs' rights to equal protection of the law secured under Fourteenth Amendment of the Constitution of the United States as well as the laws of the Commonwealth of Puerto Rico.

4.67    As a result of the raids and threats received by Plaintiffs, they have suffered the absence of their pets, the fear of the raids and being evicted; the humiliation of this abuse and the impotence and powerlessness of official authority employed by Defendants to deprive Plaintiffs of their pets.  They also feel shame as a result of having surrendered to intimidation.  Defendants with their actions were very successful at reminding Plaintiffs of their subordinated, inferior and subservient conditions as a result of their socio-economic conditions.

4.68    Upon information and belief, these law enforcement type raids for the purpose of pet-confiscation have been conducted only against residents of public housing communities; thus, they have not occurred in private subdivisions or more affluent neighborhoods.  Defendants' custom and policy of deprivation of civil rights and the actions in furtherance of the their conspiracy to violate the Plaintiffs' civil rights has been limited to members of public housing communities.  As such, the Defendants' violation of Plaintiffs' civil rights demonstrates an invidious discriminatory animus against members of public housing communities where through their actions, Plaintiffs were reminded of their subordinated and disadvantaged social and economic conditions.  42 U.S.C. §§ 1985 & 1986.

23

4.69     As a result of the events described above these Plaintiffs have suffered the loss of companionship, the loss of their property, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life.  The Plaintiffs estimate their loss at no less than **Five Hundred Thousand dollars each**.

4.70     As a result of the events described above these Plaintiffs have suffered the actual value of the loss of their pets and estimate their loss at no less than **One Thousand Five Hundred dollars for each pet** (**$1,500**).

4.71     At the time of these events, Defendants' conduct violated clearly established law and the rights of the citizens and Plaintiffs afforded to them under the U.S. Constitution, the Commonwealth's Constitution and relevant case law.

4.72     Defendants' conduct has proximately and directly caused, and will continue to cause Plaintiffs' irreparable injury.

4.73     Defendants' unlawful conduct, if allowed to prevail, will cause Plaintiffs' permanent irreparable injury if an injunction does not issue, as discussed, *ante.*

4.74     The injuries to Plaintiffs far outweigh any harm, which may be caused to Defendants should the Court grant the injunctive relief.

4.75     A permanent injunction and a declaratory judgment will serve the public interest in that the Plaintiffs and other citizens will not be subjected to unlawful searches and seizures; will not be deprived of their personal property without due process of law and will be granted pre-deprivation and post-deprivation remedies before the herein complained of events occur.

## V.     SPECIFIC FACTS RELATED TO EACH INDIVIDUAL FAMILY

**FACTS RELATED TO MADELINE MALDONADO, ABRAHAM VALENCIA AND THEIR MINOR CHILDREN ALEX, EDGAR AND CHRISTIAN:**

5.1    Plaintiffs Maldonado and Valencia have three minor children Alex (age 10), Edgar (age eight) and Christian (age six) respectively, who reside in *Residencial Plazuela*.

5.2    On October 10, 2007, during the raids in the Residencial Plazuela Defendants went to the Valencia-Maldonado residence during regular working hours; however, no one was home.

5.3    Plaintiffs had a four-month old Labrador Retriever with a red collar and dog-tags on the collar.

5.4    At the time of the raid the Valencia-Maldonado family was not home but the Defendants proceeded to enter the home premises, specifically in the laundry area, without authorization and without a duly obtained search warrant.

5.5    Neighbors and other Plaintiffs witnessed the removal of the Valencia family dog by Defendants.

5.6    When the family arrived later during the day they were informed by their neighbors that their dog had been confiscated by Defendants.

5.7    As a result of the events of the removal described above and the events that followed the removal, these Plaintiffs have suffered emotional damages, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above.  Plaintiffs estimate their loss at no less than Five Hundred Thousand dollars each.

5.8    Later, Plaintiffs learned of the whereabouts of their dog.  They proceeded to visit the area under the Paseo del Indio bridge and in fact recognized their dog, dead, under the bridge.

**FACTS RELATED TO CARMEN VAZQUEZ MINOR CHILDREN DEREK CRUZ AND ALEX JOEL VAZQUEZ:**

5.9    Ms. Vazquez and her children live in *Residencial Plazuela of Barceloneta*.

5.10    The Vazquez family owned and cared for a small dog, named Tyron. Tyron was kept

in the laundry area on a leash.

5.11    On the day that the Vazquez's dog was illegally taken from them, Ms. Vazquez heard her pet frantically barking; when she went to see the cause of the commotion, Defendants had entered into the laundry area of her home, without authorization and they had seized her dog.

5.12    She immediately investigated and found that municipal employees from Barceloneta, the Mayor himself, Sol Luis Fontánez, and employees from Animal Control Solution were snatching pets from owners in the housing project.

5.13    Ms. Vazquez protested the illegal entry and the seizure of her dog, to no avail.  In fact, she was forewarned that if she attempted to resist she would face eviction and the specter of being homeless.

5.14    The elder child, Derek, aged nine was present and witnessed all the cruelty with which his pet was removed.  All three have suffered greatly due to the loss of the pet and also due to the manner in which the municipality and the other Defendants acted.

5.15    Ms. Vazquez later learned the dogs had been hurled from a bridge and that some had broken backs and legs and others had died. As a result of the events described above and the events that followed the removal these Plaintiffs have suffered emotional damages, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above.  The Plaintiffs estimate their loss at no less than Five Hundred Thousand dollars each.

### FACTS RELATED TO MARIA RIOS COLON AND HER CHILDREN CARLOS DAVID COLON, LEONIEL MELENDEZ, AND JESUS MELENDEZ:

5.16    Ms. Maria Rios Colon lives with her children in *Residencial Plazuela*.

5.17    Ms. Rios and her children kept and cared for  three very small dogs, Reina (year and half old), Princesa (three years-old) and Choco (five months-old).

26

5.18    Ms. Rios is a mental health patient who suffers from depression.

5.19    On October 8, 2007, Ms. Rios and her children were victimized by all Defendants when their pets were illegally removed from their homes with threats of eviction.

5.20    On the mentioned date Defendants executed a police raid in the housing project were Plaintiff Rios lives, with the objective of depriving them by force and coercion of their pets allegedly because Defendants cited a no-pet policy in the public housing project.

5.21    Ms. Rios contacted  Defendant Riquelme and inquired as to why this was being done and to what shelter were the dogs being taken to.  Riquelme advised Rios that she had no option, otherwise, she would face immediate eviction.

5.22    The Defendants went again to the Rios residence on October 10, 2007, and again in a commanding tone ordered Plaintiffs to hand over their dogs or face immediate eviction.  Facing the specter of being homeless, with three small children, the fear prevented her from defending her rights and she surrendered her dogs.

5.23     Ms. Rios later learned the dogs had been hurled from a bridge and that some had broken backs and legs and others had died.

5.24    Defendants never explained to her or any other residents the procedural or substantive rights they had.

5.25    All four have suffered greatly due to the deprivation of the animals without any due process, the violent and inhumane manner in which the raids were conducted, the loss of privacy and dignity individually and collectively, the loss of the pet and the emotional impact upon learning that their pets had undergone a violent, cruel and illegal death when the defendants hurled the pets from a bridge causing their death or, in some cases broken backs or legs.

5.26    The Plaintiffs estimate their loss at no less than Five Hundred Thousand dollars each.

**FACTS RELATED TO RUTH VIDOT AND HER CHILDREN JAHAIRA SANTANA, MARIA LUISA SANTANA, LUISA MARIA SANTANA, GRACE SANTANA, VIRGEN RIVERA AND MARIA DAHLIA RIVERA:**

5.27    The Santana-Vidot family lives in Residencial Plazuela.

5.28    On October 8, 2007, Defendants went to the Vidot  residence where she lived with her children and their eight year old, Blackie, as part of the raid to remove domestic animals from the residences.

5.29    Ms. Vidot was not at home because she was in the hospital with one of her daughters. Upon her return she was informed by her other children that Defendants had raided the housing community and had removed Blackie without anyone's authorization.

5.30    At the time, her eldest daughter Brenda who does not live with Ms. Vidot was threatened with eviction; under such coercion and intimidation, Ms. Vidot's daughter surrendered the pet.

5.31     Ms. Vidot  never had a chance to allege and protect her rights and her dog was taken without any due process of law.

5.32    The Vidot family later learned the dogs had been hurled from a bridge.

5.33    As a result of the events of removal described above and the events that followed the removal these Plaintiffs have suffered emotional damages, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above.  The Plaintiffs estimate their loss at no less than Five Hundred Thousand dollars each.

**FACTS RELATED TO LUZ RODRIGUEZ AND JUDY ANGELIE:**

5.34    Ms. Rodriguez and her child Judy Angelie  live in the *Residencial Antonio Davila* in Barceloneta.

5.35    The family owned and cared for "Princess" a dog that  was like a family member.

28

5.36     At the time of the relevant events the small pet was pregnant.

5.37     On October 8, 2007, Ms. Rodriguez and her children were victimized by all Defendants when their pet was illegally removed from their home under threats of eviction.   On that day, several of the Defendants from ACS and the Municipality, some dressed in uniforms from the Civil Defense, in a commanding and intimidating tone, ordered Plaintiffs to surrender their dog or face immediate eviction.

5.38     Ms. Rodriguez and her family later learned that the dogs had been hurled from a 50 foot bridge to its death.

5.39     As a result of the events described above and the events that followed the removal, these Plaintiffs have suffered emotional damages, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above.   The Plaintiffs estimate their loss at no less than Five Hundred Thousand dollars each.

### FACTS RELATED MAYRA VALLE HER CHILDREN THALIA PEREZ VALLE AND ENID PEREZ

5.40     Mrs. Mayra Valle lives with her children  Thalia (age 10) and Enid (age nine) in *Residencial Antonio Davila Freytes*.

5.41     The family had three cats Ceniza, Monty and Misibu.

5.42     On October 8, 2007, a raid was effected in the housing project and the child Thalia, age 10, was holding the cats when several of the Defendants from ACS and the Municipality in a commanding tone ordered the child  to hand over their cats or her mother and sister would be thrown out of the housing project.

5.43     As expected, overwhelmed and out of fear, the child surrendered her cats resulting from Defendants' threats that they would be homeless and the ensuing harm to her family.

29

5.44    The child witnessed the cruel removal of the family pets and later learned, as did her mother, that they had been thrown off a 50 ft. bridge nearby.

5.45    The child again saw her pets in the news in a pile of dead animals at the foot of the abyss from the television news.

5.46    As a result of the events of removal described above and the events that followed the removal these Plaintiffs have suffered emotional damages, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above.  The Plaintiffs estimate their loss at no less than Five Hundred Thousand dollars each.

## FACTS RELATED TO JENNIFER JIMENEZ AND HER CHILDREN JANICE TORRES AND JOEDNIEL TORRES

5.47    Mrs. Jimenez and her children Janice Torres and Joedniel Torres, four and one years of age, respectively live in Residencial Plazuela in Barceloneta.

5.48     The Jimenez family were the owners of a one-year old puppy named Duque to which the children and their mother had grown very attached**.**

5.49    On October 8 , 2007, Defendants went to the Jimenez  residence as part of a raid for the illegal removal of dogs without any search warrant.

5.50    On that day,  Defendants,  some dressed in uniforms from the Civil Defense and some from the ACS, in a commanding tone ordered the Plaintiffs to hand over their dog or face immediate eviction.

5.51    Defendants never allowed Plaintiffs to learn or otherwise use any procedure that may have allowed them to challenge the action.

5.52    The dog was surrendered to Defendants in compliance with threats and orders and out of fear of being evicted.

5.53    As a result of this ordeal, Janice, the three-year old now says her pet was taken and killed by the "Police."

5.54    As a result of the events of the pet removal described above and the events that followed, Plaintiffs have suffered emotional damages, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above. Plaintiffs estimate their loss at no less than Five Hundred Thousand dollars each.

### FACTS RELATED TO MARIYUNAIRA RIVERA AND MINOR CHILD VICTOR MANUEL NEGRO.

5.55    Ms. Rivera lives in *Residencial Plazuela* with her minor child who suffers from multiple health conditions.

5.56    The family owned and cared for a pet cat named Chupy for more than a year.

5.57    During the raid of October 8, 2007, the Mayor himself and Defendant Riquelme knocked on Plaintiff Rivera's door in order to confiscate her cat.

5.58    Although Ms. Rivera was able to hide her pet and prevent its removal her five-year old child, visibly ill, began to throw up and remained ill for a period of time.

5.59    Ms. Rivera and her child have great fear that her pet will be removed and killed at any time by Defendants.

5.60    The child and Ms. Rivera have been impacted by the nature of the raid, the ruthlessness of Defendants and the collective violation of rights in a community of which she is part.

5.61    Both Plaintiffs have suffered damages as a result of the illegal and intentional acts of Defendants and estimate their damages at Five Hundred Thousand Dollars each.

### FACTS RELATED TO RAFET CANDELARIA

5.62    Plaintiff Rafet Candelaria Perez lives in *Residencial Plazuela* with his pets.

5.63    Candelaria owned and cared for  small dogs, Chispy, a pregnant female (four years old) and her offspring Broqui (two months old).

5.64    On Sunday October 7, 2007, Candelaria received a letter stating a no-pet policy and a warning of eviction, in spite of the fact that Candelaria's contract states otherwise.

5.65    On Wednesday October 10, 2007, and as part of the second raid against residents with pets, Defendants illegally and through coercion and threats of eviction seized Chispi and Broqui.

5.66    The response to Candelaria's objections was that the dogs would be in a shelter and Candelaria surmised that he could retrieve his dogs in order to make arrangements for their safety. Defendants were lying, Candelaria later learned that the dogs had been hurled to their death and definitely the intentions of the ACS and Barceloneta was that the dogs would brutalized to death.

5.67    Since the events to which Defendants subjected the residents of public housing on October 8, 2007 and October 10, 2007, Candelaria is emotionally ill and especially since he was told a lie, that his dogs would be placed in a shelter.  As a result of these events described above and the events that followed the removal Candelaria's dogs, he has suffered emotional damages, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above.  Plaintiff estimates his loss at no less than Five Hundred Thousand dollars.

5.68    Plaintiff Candelaria was interviewed by several news organizations regarding the events complained of herein.  Additionally, Mr. Candelaria, participated in public protests in front of City Hall regarding these same events.  As a result of engaging in these public protests Mr. Candelaria was given a letter of discharge from his employment with the Defendant Municipality.  However, shortly thereafter, the Mayor physically took the letter from the Plaintiff tore the same up. **FACTS RELATED TO JOANNA GONZALEZ AND HER MINOR CHILDREN JOSE E DE JESUS (AGE 10), MARIA DE LOURDES DE JESUS (AGE NINE), JESUS DE JESUS (AGE EIGHT) AND AGUEDA M SERRANO (AGE THREE).**

5.69    Ms. Gonzalez and her children live in *Residencial Plazuela.*

5.70    Ms. Gonzalez and family owned and cared for two pets, Chispa and Putin.

5.71    On October 8 and 10 of 2007, Defendants raided the housing complex in order to confiscate the residents' pets.  As part of the raid, Gonzalez's pets were removed without a warrant.

5.72    Chispa was removed on October 8, 2007, when Ms. Gonzalez was in the hospital and Putin, a puppy was removed in her presence by threats and coercion on October 10, 2007.

5.73    Ms. Gonzalez witnessed the injections by Defendants on her neighbor's dogs, specifically the injections on Rafet Candelaria's dogs.

5.74    Ms. Gonzalez's young children continue to inquire why were their pets no longer with them, causing the family to experience a sense of loss, grief and humiliation.

5.75    As a result of the these events described above and the events that followed the pet removal, Ms. Gonzalez  has suffered emotional damages, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above.  Plaintiff estimates her loss at no less than Five Hundred Thousand dollars each.

5.76    Ms. Gonzalez also witnessed that ACS employees participated jointly with municipal employees and municipal police in the raids.

**FACTS RELATED TO ELVIA TIRADO**

5.77    Ms. Elvia Tirado is a resident of *Residencial Antonio Davila Freytes.*

5.78    Ms. Tirado is an elderly lady and the owner of a small pet named Lassie which is essential for Ms. Tirado well being and health.

5.79    Although Ms. Tirado was able to hide and remove her dog from the premises, she witnessed all the abuses which resulted in the raid and later learned that the dogs had been hurled off a bridge impacting her greatly.

33

5.80    Ms. Tirado, as with all the other Plaintiffs, was never given any opportunity to challenge the actions of Defendants and she had to resort to hiding and secretly transferring her dog out of the housing complex even though Ms. Tirado is quite elderly.

5.81    Ms. Tirado now lives in fear that her precious companion of eight years will be removed abruptly from her home.

5.82    All the events surrounding these events have caused Ms. Tirado great pain and suffering.  As a result of the events of described above and the events that followed, the pet removal Tirado has suffered emotional pain, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above.  Plaintiff estimates her loss at no less than Five Hundred Thousand dollars.

### FACT RELATED TO CARMEN VALLE

5.83    Ms. Valle is an elderly lady who resides in *Residencial  Antonio Davila Freites*.

5.84    On October 8, 2007, during the raids in the *Residencial Antonio Davila Freites* Defendants went to Ms. Valle's residence during regular working hours; however, no one was home.

5.85    Ms. Valle's dog was removed from her apartment without her authorization and using police tactics normally used in drug raids.

5.86    Ms. Valle is also the grandmother of minor Thalia  Perez Valle, a minor whose pets (cats) were illegally removed from her custody while her mother was not present.

5.87    As a result of the events of described above and the events that followed the pet removal, Ms. Valle has suffered emotional pain, great anguish, stress, anxiety, sadness and a sense of loss of enjoyment of life from the illegal acts described above.  Plaintiff estimates her loss at no less than Five Hundred Thousand dollars each.

### FACTS RELATED TO MARIBEL RIVERA VARELA AND MINOR CHILDREN

**KEYSHA AND NAYSHA**

5.88    Ms. Rivera lives with her daughter Keysha and Naysha, 15 and eight, respectively in *Residencial Plazuela in Barceloneta.*

5.89    The Rivera family owned and cared for a dog named Coyen (three years old).

5.90    On October 8, 2007, while the Rivera family was not home Defendants invaded their premises and without authorization or a warrant, removed Coyen in order to kill him.

5.91    The family learned of the events of the raid and the fate of their beloved pet upon their return and have since then suffered for this loss great anxiety, pain, shock, disbelief, a sense of abuse and humiliation, apprehension and the like.

5.92    As a proximate result of the events and the harm inflicted upon the Rivera family the Plaintiffs estimate their loss at Five Hundred Thousand dollars each.

**FACTS RELATED TO ANTONIA MORALES AND MINOR CHILDREN KELVIN AND RANDY.**

5.93    Ms. Morales lives in *Residencial Plazuela* in Barceloneta with her two sons Kelvin age 20 and Randy, age 13.

5.94    She owned and cared for a small dog named Becky who was her constant companion for three years and her sons' dog, Peludo.

5.95    On October 8, 2007, Becky was taken as part of the raid described above when Defendants threatened Morales that if she did not surrender the dog they would evict her.

5.96    Defendants were not authorized to take and much less kill the Morales' dogs.

5.97    Defendants never afforded the Morales' an opportunity to know their rights much less to exercise them.

5.98    Morales, as other Plaintiffs, have a contract which does not ban pets in their homes.

35

5.99     Ms. Morales also suffered the removal of the community's darling pet Peludo who belonged to her son.  She witnessed Peludo cruelly mistreated and handled, slammed into the van and later learned he was, in fact, one of the dogs found in the pile beneath the bridge El Paseo del Indio.

5.100    As a proximate result of the events and the harm inflicted upon the Morales family the Plaintiffs estimate their loss at Five Hundred Thousand dollars each.

**FACTS RELATED TO JUDITH VARELA AND MINOR CHILDREN JOHAMED RIVERA (AGE EIGHT), JULIAN LOPEZ RIVERA (AGE 15) AND ASHLEY RIVERA (AGE 11).**

5.101    Varela lives in *Residencial Plazuela in Barceloneta*.

5.102    She owned and cared for a small dog named Chispi (five year old).

5.103    She was approached by Defendants and threatened by them to surrender her dog or face eviction.

5.104    Plaintiff Varela was not oriented about the proper procedural rules to be followed in relation to her challenge of such an action.

5.105    She never authorized the taking of her property and the killing of her dog.

5.106    The minor children named above are the grandchildren of Varela who are orphans and she has their custody.

5.107    Minor child Julian Lopez is a special education student who witnessed the raids and events and as a result threatened to kill himself.

5.108    As a proximate result of the events and the harm inflicted upon the Rivera family the Plaintiffs estimate their loss at Five Hundred Thousand dollars each.

**FACTS RELATED TO SONIA KORTRIGHT-SANCHEZ' CLAIMS**

5.109    Kortright lives in *Residencial Plazuela* Barceloneta.

5.110    Kortright owned and cared for a four-year old female dog named Angelica who was

36

her comfort and companion.

5.111   Ms. Kortright was threatened with eviction if she did not hand Defendants her dog. She never authorized the removal and taking of her dog much less the killing of her dog by ACS and the other Defendants.

5.112   Plaintiff was not oriented about the proper procedural rules to be followed in relation to her challenge of such an action and her contract allows her to have such pet.

5.113   Plaintiff Kortright has suffered pain and anguish as wells as anxiety as a direct result of the abusive and dictatorial conduct of Defendants, who took her dog when he was hiding under a car in front of her house and she could not get her dog back as she was threatened with eviction.

5.114   As a proximate result of the events and the harm inflicted upon Kortright, she estimates her loss at Five Hundred Thousand dollars.

### FACTS RELATED TO DAISY CABALLERO CRUZ AND MINOR CHILDREN WILFREDO DE LEON CABALLERO, ADNERSY RODRIGUEZ CABALLERO, RAFAEL J. RODRIGUEZ CABALLERO AND MELQUISEDEC MAISONET CABALLERO.

5.115   Ms. Caballero and her children live in Residencial Plazuela in Barceloneta.  Ms. Caballero and her children own a dog named Negri who for three years was the family pet.

5.116   On October 8, 2007,  Ms. Caballero saw numerous people, including the Mayor and what seemed like a Police officers and employees of Animal Control Solution in the community.

5.117   Once Ms. Caballero verified the cause of the commotion, which responded to a raid by Defendants designed to confiscate their pets, she instructed one of her children to flee the home and hide the dog or they would lose their home.

5.118   Ms. Caballero then hid from Defendants and their ensuing raid.  In fact, Defendants asked neighbors for her whereabouts; however, they had to leave without finding her.  In the

meantime, Ms. Caballero had to search for her son who had fled with the dog and went into deep hiding as a result of the fear and apprehension caused by Defendants' dog-confiscation raid.

5.119   On October 10, 2007, Defendants returned to Ms. Caballero's home and Iris Febles and Mr. Santiago (also known as Nino)  in a threatening and commanding tone of voice ordered Ms. Caballero to hand over her dog.  However, she responded she had removed the dog and they left.

5.120   Ms. Caballero's pet is not only a beloved family member, but is instrumental to the well being of her children; one in particular who was recommended to have a pet for therapeutic purposes given his status as a special education child.

5.121   As a proximate result of the events of the raiding of the community and the attempts by defendants to remove Plaintiffs' pet the family has suffered pain, anguish, anxiety, trauma, sleep disturbance and the child Rafael J. Rodriguez refused to attend school.

5.122   As a proximate result of the events and the harm inflicted upon the Caballero family the Plaintiffs estimate their loss at Five Hundred Thousand dollars each.

### FACTS RELATED TO JACQUELINE SANTIAGO AND MINOR CHILD KIARA RODRIGUEZ SANTIAGO

5.123   Ms. Santiago lives in Residencial Plazuela in Barceloneta, Puerto Rico.  She owned two dogs Osita (three years old) and Beba (two years old).

5.124   On October 8, 2007, Ms. Santiago was warned by neighbors that a raid was taking place and the pets were being taken by municipal employees and the others (Defendants in this case). Ms. Santiago saw municipal employees, one commonly known as Nino and the other, Jose Ivan Cacho participating in the raid.  She proceed to flee her home and hide her pets.

5.125   On October 10, 2007, again Ms. Santiago witnessed Defendants raiding the community and confiscating the neighbors' pets; even in cases where the pets were inside the safety zone of the

home while the owners were not present.

5.126   As a result of the events which give rise to this claim the Plaintiffs suffered pain, sadness, fear and nervousness.  She suffers from fear due to the threat of eviction and, although her pet was not taken she fears the repetition of the acts.

5.127   As a proximate result of the events and the harm inflicted upon the Santiago family the Plaintiffs estimate their loss at Five Hundred Thousand dollars each.

### FACTS RELATED TO ANGEL RAFAEL SIERRA, EVELYN VAZQUEZ AND MINOR CHILDREN ANGELICA (16), KARINA (15), SORIMAR (14), CHRISTOPHER (13), NEYSHA (11), MIGUEL ANGEL (10)

5.128   The mentioned Plaintiffs live in *Residencial Quintas de Barceloneta* (also known as Quintas Hector Ruiz).  They owned a seven-month old female dog, named Tuti.

5.129   On October 8, 2007, Mr. Sierra's neighbor witnessed the Defendants removing the family pet from Plaintiff's front balcony; however they had no authorization or warrant to do so.  The Defendants then slammed the dog against the van's side panel.

5.130   The neighbor called Mr. Sierra and informed what was occurring.  Plaintiff immediately arrived at the community with all of his kids in his car.  He tailed the unmarked van to an unidentified location.  Once the van stopped, three people stepped out, one was the municipal employee,  Nino, and two unidentified individuals.

5.131   Plaintiff confronted Nino with his action of taking his dog which was a cause-in-fact of his children's clearly visible emotional state, who were crying and were distraught.  Mr. Sierra even offered to pay a fine, if one was required, in order to have the family dog returned.

5.132   Nino responded that the dog had been taken to Carolina to be put to death.  Sierra requested that he be allowed to look inside of the van because he believed his dog to be in there, but was blocked by Nino and the others.

5.133   Later during the same day, Mr. Sierra returned to the same location and pleaded with the unknown persons.  At this point Plaintiff was begging and crying for his dog to be returned but they refused.  He was given a business card by a female who told him he could call the phone number on the card the next day.

5.134   On Tuesday October 9, 2007, when Mr. Sierra was finally able to make contact after several unsuccessful attempts in order to regain his dog, a person identifying himself as a "veterinarian" told him that his dog had been sent to Carolina to be put to sleep and hung up the phone on Plaintiff.

5.135   Not satisfied with the ordeal that the Defendants had subjected the Sierra family to, they returned to the Sierra residence on Wednesday October 10, 2007.  Nino and two unidentified males, in an authoritarian and arrogant tone demanded that Plaintiffs turn over any additional pets that they may have missed during the first raid.  Mr. Sierra retorted that he had no other pets and reminded them they had already taken his dog without permission.

5.136   During the early evening hours of Thursday October 11, 2007, Plaintiff learned that there were dogs under the  Paseo del Indio bridge and he proceeded to go and investigate the location to see if he could identify his dog.  Plaintiff went with his children and identified his dog by the collar and the short docked tail.  The dog was dead, with many other dogs.

5.137   Plaintiff returned Friday, October 12, 2007, during the day and again verified and corroborated that it was his dog laying there and identified the dogs of three of his neighbors.

5.138   As a result of the events described above, Sierra and his family have suffered great sadness, a deep sense of loss and of being humiliated and abused, anxiety, sleep disturbance, great anger, depression, crying, nervousness and a loss of general enjoyment of life presently and  in the foreseeable future.

5.139   As a proximate result of the events and the harm inflicted upon the Sierra family the Plaintiffs estimate their loss at Five Hundred Thousand dollars each.

### FACTS RELATED TO RAMONA OJEDA GONZALEZ

5.140   Ms. Ojeda is 76 years elderly lady old who lives alone in Quintas de Barceloneta except for the companionship of two cats named Ninina and Gatita up to the day when she was illegally deprived of her pets by Defendants.

5.141   On October 8, 2007 an employee of ACS approached Plaintiff in her home and identified himself as an employee of ACS and told her to turn the cats over and if she did not, she would be evicted.  Plaintiff feared eviction at this late stage in her life and was intimidated but managed to inquire as to where they would be taking her cats.  Nino and another employee watched at a short distance while Ms. Ojeda talked to the ACS employee.

5.142   Ms. Ojeda felt she had no choice but to let the Defendants remove her cats.  Ms. Ojeda is a cardiac patient, as a result of this ordeal she had to receive additional medication as the impact from the removal of her companions affected her health both physically and emotionally.

5.143   As in the case of all the other Defendants, Ms. Ojeda was not given an opportunity to object to this confiscatory raid, or an opportunity to present a or plea any rights that might assist her.

5.144   As a result of the illegal taking under coercion and threat of her pets and the failure to let Ms. Ojeda know of any rights that she might have raised in her defense or the right to have pets in her home Ms. Ojeda could not raise any defense nor protect her rights.  As a proximate result of the events that have been described herein which culminated with the loss of her pets Ms. Ojeda has suffered anxiety, physical harm, nervousness, depression, loss of sleep, loss of apatite, crying spells and loss of property and enjoyment of life.

5.145   As a proximate result of the events and the harm inflicted upon Ojeda, she estimates her loss at Five Hundred Thousand dollars.

### FACTS RELATED TO ANGELICA VALLE AND MINOR CHILDREN ELBI MOLINA (13), KELVIN MOLINA (11), IDALY MOLINA (TWO)

5.146   These Plaintiffs live in Quintas de Barceloneta and owned and cared for Yoli, a dog who was thrown from the bridge Paseo del Indio but fortunately survived.

5.147   On October 8, 2007, without authorization while the Plaintiffs were not home, the Defendants took Yoli from Plaintiffs' front porch as the neighbors told Ms. Valle what occurred. Such action was without a warrant.  The loss of their dog due to the illegal acts of Defendants have affected all the family but most of all Kelvin Molina who was most attached to the pet.

5.148   Yoli was later found trapped by debris with a broken hip and taken to a veterinary clinic where she is recovering from the horrendous actions inflicted upon her by Defendants.  As a result of the illegal taking of their pet Yoli and the suffering they know she has undergone, Plaintiffs have suffered anxiety, crying spells, nervousness, depression, loss of sleep, loss of appetite, the children do not want to go to school and in general their life has suffered a diminished sense of well being; seeing the episodes in news coverage has exacerbated Plaintiffs' conditions.

5.149   Ms. Valle and her children had a brief encounter with Yoli when they visited the dog at the clinic providing the care.  However, such encounter has been marred by grief at seeing their pet, an exuberant friend, be maimed by Defendants.

5.150   As a proximate result of the events and the harm inflicted upon the Valle family the Plaintiffs estimate their loss at Five Hundred Thousand dollars each.

### FACTS RELATED TO OMAR RODRIGUEZ

5.151   Plaintiff lives in the Residencial Quintas de Barceloneta with his mother.  He owned and cared for a dog named Negrita, three years old.

42

5.152   On October 8, 2007, Defendants came into the community to illegally seize the residents' pets; however, they missed Negrita on the first raid.  On October 10, 2007, Defendants returned to take the dog.

5.153   On October 10, 2007, Ms. Alma Febus incessantly told the Defendants they could not take the residents' dogs and that they had to give her a chance to prove to them that the housing regulations did not prohibit the pets.  Defendants refused to entertain Mrs. Febus' claims and continued to raid the community.

5.154   Plaintiff lost his pet and has suffered pain, anguish, sadness as a proximate result of the loss of both his property and well being.

5.155   As a proximate result of the events and the harm inflicted upon  Rodriguez, Plaintiff estimates his loss at Five Hundred Thousand dollars.

**FACTS RELATED TO ANDREA RODRIGUEZ OTERO AND FELIX DE LEON**

5.156   Ms. Rodriguez (age 58) lives in Quintas de Barceloneta and until the raid carried out in the community, she lived with her dog Negri for nine years.  Her husband is disabled and their pet even slept with them in their bedroom; such was the affection for their pet.

5.157   On October 8, 2007, when Ms. Rodriguez was threatened with eviction she traveled to Morovis in order to hide her pet but was unable to place her dog with relatives.  Later, she traveled to Vega Baja and was able to find a home for her pet.  She has not been able to recover her pet because she fears the reprisal and the actions from Defendants of another raid where her pet might be taken.

5.158   As a result of the raids and threats received by Plaintiffs Otero and De Leon, they have suffered the absence of her pet, the fear for his life, the fear of the raids and being evicted, the humiliation of abuse and the impotence and powerlessness of official authority employed by

43

defendants to deprive Plaintiff of her pets. She also feels shame as a result of having surrendered to intimidation. Defendants with their actions were very successful at reminding Plaintiffs of their subordinated and subservient condition.

5.159   As a proximate result of the events and the harm inflicted upon these Plaintiffs, they estimates their loss at Five Hundred Thousand dollars each.

**FACTS RELATED TO EVELYN SOLER DAVILA**

5.160   Plaintiff Soler lives in Quintas de Barceloneta. She owned, loved and cared for a pedigree dog, a Schnauzer.

5.161   On October 8, 2007, Defendants knocked on her door and she locked herself in. She saw six to eight people at her door; however, she refused to surrender her dog. They gave her an ultimatum until Wednesday October 10, 2007, to get a rid of her dog or face eviction. In order to keep her dog safe she decided to give her dog away to a third person and took the dog to the new owner.

5.162   Plaintiff Soler visited the office of the Administrator demanding that the Mayor treat them with respect and the same as he would do if they were residents of a wealthy neighborhood where she understood that he would not dare act the way he was acting in the public housing. She stated to the Administrator that the residents had a right to be heard and that the Mayor had to come into the community and meet with the residents. Such hearings, never took place and the raids continued.

5.163   Ms. Soler understands that she cannot retrieve a dog that she has given away in such conditions. Her actions to give away her dog to a third party who could care, love and protect the dog were actions compelled under threats, coercion and duress of foreseeable consequences.

5.164   Mrs. Soler has suffered anger, humiliation, sadness, the loss of the dog she so much cared for and she estimates her losses at no less than Five Hundred Thousand dollars.

**FACTS RELATED TO VANESSA GUTIERREZ AND MINOR CHILDREN
STEPHANIE MOYA (EIGHT) AND KENNETH ESCOBAR (FIVE)**

5.165   Plaintiff Gutierrez  lives in Quintas de Barceloneta with her minor children and her

pet a two year old Chihuahua.

5.166   On October 8, 2007, Defendants went to  Ms. Escobar's home demanding to take the

dogs or be evicted.  The  children were able to hide inside their home and hide their dog.

5.167   On October 10, 2007, Defendants returned  with the municipal police and rather than

knock on Plaintiffs door, they went around the back and banged on her window and demanded to take

the dog because they alleged to have pictures taken by the Administrator.  They also informed her that

if she did not surrender the animal they would be evicted.  Ms. Gutierrez told them she would rather

face eviction or find a new home than give them her children's dog.   In spite of the fact that Plaintiff

clearly told Defendants she would not surrender the pet, they rattled their gate as if attempting to enter

the home.  At this point Ms. Gutierrez threatened with a lawsuit.

5.168   The children were terrorized and hiding with their dog.  Ms Escobar had to leave her

home and take the children and the dog to her parents' home because the children feared the return

of Defendants and for the safety of their beloved pet.  They stayed in their grandparent's homes for

several days.  The youngest child has been released from psychological, rehabilitation and speech

therapy and the events that have been described have harmed him to a point where he has relapsed

and is again in therapy.

5.169   Plaintiffs have suffered terror, apprehension, sleep disturbance, fear of losing their

home, loss of their dignity and privacy was stripped from them and the threats were very real specially

having been carried out as to other neighbors.

5.170   As a proximate result of the events and the harm inflicted upon these Plaintiffs, they

estimate their loss at Five Hundred Thousand dollars each.

### FACTS RELATED TO BLANCA MEDINA AND HER MINOR CHILD CARLA MICHELLE COLON

5.171   Ms. Medina lives in Quintas de Barceloneta with her daughter Carla Michelle Colon, seven years old and a pet named Moti, a cat which she has owned for four years.  The child reports that they want to kill the neighborhood dogs and continues repeating the horrific episode and fear of their re-occurrence, which she witnessed in horror.  The child has remained affected.

5.172   On October 5, 2007, Plaintiffs were notified, via letter, that they could no longer have pets.  On October 10, 2007, when the Defendants raided the community seeking to confiscate the residents' pets, Ms. Medina hid the cat but has been unable to bring the cat home because her child fears for his safety because the child believes the pet will be killed by the same people who killed the others.

5.173   On the day of the events, Defendants knocked on her door with very hard and authoritarian knocks.  Nino, a municipal employee, instructed Ms. Medina to give him any "cat, dog, bird or any pet" she may have or face eviction.

5.174   Ms. Medina witnessed when municipal employees blocked the path of a neighbor's car impeding her egress from the community demanding that the neighbor surrender any pets in the car as the resident attempted to flee for her own safety and that of her pets.

5.175   The events witnessed by the Plaintiffs of the dragging and taking of the neighbors pets has had an impact in the life of these Plaintiffs, specially the dog which belonged to Angelica Valle who the Plaintiffs have witnessed in the news as trapped under debris with a broken hip.

5.176   As a proximate result of the events and the harm inflicted upon the Medina family, they estimate their loss at Five Hundred Thousand dollars each.

### FACTS RELATED TO CARMEN LUZ AGOSTO ROMAN AND MINORS PRISCILLA HOWARD (FOUR) JOHN HOWARD (10) EDWIN HOWARD (17) JOSHUA LAMOUTTE (14)

5.177    Ms. Agosto lives with her children in Quintas de Barceloneta and she owns and cares for a dog named "Buster" for the last six or seven years.

5.178    On October 8, 2007 and October 10, 2007, Ms. Agosto saved her dog by not opening the door and refusing to surrender the pet. The raid terrorized all the children in the community but very specially John Howard, age 10, who is very attached to his dog to the point that, John's pediatrician advised that the removal of his dog would severely impact him. In fact, John hid and threatened that in order to take his dog they would have to kill him first.

5.179    The events described herein on the mentioned dates and the events which followed when the discovery was made that the dogs taken from the housing communities in Barceloneta had been killed by plunging them from a 50 feet bridge known as Paseo del Indio have affected all Plaintiffs and the Agosto family.

5.180    As a proximate result of the events and the harm inflicted upon these Plaintiffs, they estimate their loss at Five Hundred Thousand dollars each.

**FACTS RELATED TO EVELYN TALAVERA AND MINOR CHILDREN HECTOR LAUREANO (AGE 13) AND LUIS LAUREANO (AGE 11)**

5.181    The Plaintiffs live in Quintas de Barceloneta with minor children and a pet named "Taylor", a one year old dog.

5.182    On October 8, 2007, when the Defendants conducted the raid seeking to confiscate all of Plaintiffs' pets, minor Plaintiff Hector Laureano was able to protect his dog Taylor by initially fleeing the home and then climbing on the roof and remaining in hiding while until the immediate danger of having the dog taken away subsided. Later, the dog was hidden in one of the bedrooms and the family, through surreptitious action managed to take Taylor to a relatives home in order to save him.

5.183   The Defendants, frustrated by Plaintiffs' resolve to not surrender Taylor, threatened with a repeat raid to their home.

5.184   On October 10, 2007, the Defendants returned to Plaintiffs home looking for Taylor. However, Plaintiffs' foresight of Defendants motivations and intentions of the mass killing of pets precluded them from Killing Taylor.

5.185   Plaintiffs have suffered terror, fear, apprehension, sleep disturbance, crying spells, their dignity and privacy was stripped from them and the threats were very real specially having been carried out as to other neighbors.  In fact, the children missed school for a period of time as a result of this ordeal.

5.186   As a proximate result of the events and the harm inflicted upon these Plaintiffs, they estimate their loss at Five Hundred Thousand dollars each.

### FACTS RELATED TO ROSA RODRIGUEZ MARIN AND MINOR CHILDREN BRYAN CORTES (NINE), VIRGINIA CORTES (10) ROSA CORTES (13).

5.187   Plaintiffs live in Quintas de Barceloneta with minor children and a pet named "Gordito" three years old and Chispita two month old.

5.188   When she was threatened with eviction she gave the dogs away in order to save them and now she cannot get them back.  The decision made by Rodriguez to give the pets away was based on the illegal actions of Defendants when they coerced her to face eviction or remove the pets.

5.189   The son, Brian, insists that their mother bring his dog back, but she cannot.  She would not have given the dogs away except for the brutality displayed by Defendants or if they had informed Plaintiff that she had a right to object the order but the Defendants acted with arbitrary and capricious order and by misrepresenting the residents' rights under the housing rules.

5.190   Plaintiffs have suffered pain and anguish as a result of the threats of eviction and abuse

48

of power by Defendants and both Brian and Virginia have suffered more due to fear and the loss of the appetite.

5.191    As a proximate result of the events and the harm inflicted upon these Plaintiffs, they estimate their loss at Five Hundred Thousand dollars each.

### FACTS RELATED TO ELBA IRIS GUZMAN REYES

5.192    Mrs. Guzman Reyes lives in Residencial Plazuela in Barceloneta, Puerto Rico.  She owns a cat.

5.193    On Wednesday October 10, 2007  Mr. Edgardo Santiago, also known as "Nino", came to Ms. Guzman's apartment and ordered  her to hand over her cat threatening her with the termination of  her contract.   When Ms. Guzman refused to surrender her cat, Nino attempted to enter the zone of safety within Plaintiff's home.   Guzman immediately proceeded to close the door and refused to let him in.  He grabbed a radio or a cellular and overheard him say to the other person that she would be evicted.

5.194    Guzman had to close her door in order to prevent Santiago from entering her home.

5.195    As a result of the actions of Defendants and interference with Plaintiff she has suffered sadness, depression, anger, humiliation, feels she was treated in the way she was and the others because of their social condition and the threat of eviction produced great impact on her nerves.


5.196    As a result of the actions by defendants Mrs. Guzman was hospitalized for four days the very next day of the raid.

### FACTS RELATED TO JOSE RODRIGUEZ MARIN JESSICA FUENTES AND MINOR CHILDREN DAVID FUENTES (SIX) AND JOSE E. RODRIGUEZ FUENTES (1).

5.197    The Rodriguez Fuentes family live in Quintas de Barceloneta with their two minor

children.  They owned two small dogs, Scooby and Nieve.

5.198    On October 8, 2007, Defendants Leonides Gonzalez, together with several municipal employees, municipal police officers and employees of ACS arrived at the Rodriguez Fuentes home and demanded that they turn over their pets or face eviction.  Ms. Fuentes, in the final stages of a pregnancy, questioned the Defendants as to why this was occurring and where were the pets being taken to.

5.199    As a result of Defendants' coercion, Ms. Fuentes proceeded to go to her back yard to get the dog that was outside; however, the Defendants, without authorization or a warrant, had penetrated Plaintiffs zone of safety in their backyard and took Scooby.  Ms. Fuentes demanded reassurances that her dog was to be taken to a shelter.  Defendants retorted that the dog was in fact being taken to a shelter.

5.200    Not satisfied with illegally penetrating Plaintiffs' home and confiscating Scooby, on October 10, 2007, Defendants returned to confiscate the second pet, Nieve.  Defendant Leonides Gonzalez advised that she had taken two photographs and demanded that the second dog by turned over.  Plaintiffs, fearing eviction handed the dog over.

5.201    Plaintiffs have suffered pain and anguish as a result of the threats of eviction and abuse of power by Defendants.  Minor Plaintiff David, a special education student, has been particularly impacted, experiencing erratic behavior, long periods of silence and becoming despondent as a result of the loss of his pets.

5.202    Once the media reported the mass killing of the Barceloneta pets in the Paseo del Indio off of a State highway, minor Plaintiff David identified his dog Scooby as one of the few dogs that survived the ordeal; however, the repeated media reports exacerbated his symptoms.

5.203    As a proximate result of the events and the harm inflicted upon these Plaintiffs, they

estimate their loss at Five Hundred Thousand dollars each.

### FACTS RELATED TO LIZETTE AGOSTO AND MINOR BYRON CANCEL

5.204    Ms. Agosto and minor Byron Cancel (11) live in Quintas de Barceloneta with their pet, a two month old dog called "dogui".

5.205    The Administrator of the community, Leonides Gonzalez, visited her and told her that she knew she had a dog and if she did not surrender the dog she would be evicted.  This threat was also directed at minor Byron Cancel.

5.206    The boy took his dog and hid in his room to avoid turning the dog over.  Plaintiffs thereafter decompensated, broke down and started to cry.

5.207    As a proximate result of the events and the harm inflicted upon these Plaintiffs, they estimate their loss at Five Hundred Thousand dollars each.


## VI.    FIRST CAUSE OF ACTION

6.1    The foregoing allegations are repeated and alleged herein.

6.2    Defendants intentionally acted with callous and reckless disregard for Plaintiffs' fundamental rights and engaged in conduct that shocks the conscience.

6.3    Plaintiffs have a property interest in the ownership of their pets.

6.4    The intentional acts by Defendants in their refusal to provide Plaintiffs with the *pre-deprivation* remedies prior to the confiscation of their pets constitutes a violation of Plaintiffs' property rights secured under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, due process of law, namely notice requirements before such action was to occur and an opportunity to be heard.

6.5    Defendants should be enjoined from any continued or contemplated action where

citizens of public housing communities, by decree would have to turn over their pets for subsequent slaughtering with out a *pre-deprivation* remedy, *before* the action occurs.

6.6     Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## VII.     SECOND CAUSE OF ACTION

7.1     The foregoing allegations are repeated and alleged herein.

7.2     Defendants intentionally acted with callous and reckless disregard for Plaintiffs' fundamental rights and engaged in conduct that shocks the conscience.

7.3     Plaintiffs have a property interest in the ownership of their pets.

7.4     Defendants' actions and omissions where they illegally, arbitrarily and in a capricious manner confiscated and later killed Plaintiffs' pets was in violation of the their fundamental rights guaranteed and secured under the Fifth and Fourteenth Amendment.  Such actions caused an irreversible and irrevocable loss and effect to Plaintiffs' - and their children - Constitutional rights of being able to enjoy their life, liberty, property and happiness in their homes and in their pets as secured and guaranteed by the Due Process Clause (substantive) of the Fifth and Fourteenth Amendment of the Constitution of the United States as well as the laws of the Commonwealth of Puerto Rico.

7.5     Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## VIII.     THIRD CAUSE OF ACTION

8.1     The foregoing allegations are repeated and alleged herein.

8.2     Defendants acted with callous and reckless disregard for Plaintiff's rights and engaged in conduct that shocks the conscience.

8.3     Plaintiffs have a property interest in the ownership of their pets;

8.4     The intentional acts by Defendants in their refusal to provide Plaintiffs with the *post-deprivation* remedies *after* the confiscation of their pets constitutes a violation of Plaintiffs' property rights secured under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, due process of law, namely notice requirements informing citizens of their right to challenging the government's conduct, at least prior to the slaughter of their pets.

8.5     Defendants should be enjoined from any continued or contemplated action where citizens of public housing communities, by decree would have to turn over their pets for subsequent slaughtering with out a *post-deprivation* remedy, before the action occurs.

8.6     Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## IX.     FOURTH CAUSE OF ACTION

9.1     The foregoing allegations are repeated and alleged herein.

9.2     The requested declaratory relief centers on the fact that the Defendants' intentional actions and omissions in and during the confiscation of the Plaintiffs' pets constitutes a taking as it relates to the fact the Plaintiff were impeded from challenging the Defendants' conduct.

9.3     Therefore, a declaratory judgment finding such takings and policies as illegal will aid in prevent the repetition of such policies.

9.4     Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## X.     FIFTH CAUSE OF ACTION

10.1     Plaintiff reproduces and reaffirms as if alleged herein each and every one of the preceding allegations.

53

10.2    Defendants acted with callous and reckless disregard and in conduct that shocks the conscience regarding Plaintiffs' right to be free and secure in their homes, places of abode and their properties, papers and things.  The intentional acts by Defendants in their coercion and the use of threats and intimidation demanding that they turn over their pets or face immediate eviction; in their actual invasion of Plaintiffs' homes where the Defendants penetrated their zone of safety within their homes, constitutes a violation of Plaintiffs' rights to be safe and secure from warrantless searches and seizures secured under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution, namely the requirement of obtaining a warrant before they penetrated the Plaintiffs' homes and/or demanded and confiscated the pets with the intention of subsequently slaughtering them.

10.3    Defendants should be enjoined from any continued or contemplated actions where citizens of public housing communities, by decree or arbitrary action would be subjected to such flagrant searches of their homes and seizures of their properties and/or pets for subsequent slaughtering without warrants.

10.4    Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

XI.    SIXTH CAUSE OF ACTION

11.1    The Plaintiff reproduces and reaffirms as if alleged herein each and every one of the preceding allegations.

11.2    Defendants acting in concert, aiding and abbeding each other, conspired to deprive the Plaintiffs of their pets and in depriving the Plaintiffs of their Constitutional rights guaranteed by the US and Commonwealth Constitutions.  42 U.S.C. §§ 1985 and 1986.

11.3    Defendants acted with callous and reckless disregard and in conduct that shocks the conscience.  As a result of the Defendants actions and omissions where they conspired in their

54

planning, and later, acting together and in concert, conspired with and among each other to violate the Plaintiffs' Fourth, Fifth and Fourteenth Amendment Rights as well as rights secured by Commonwealth of Puerto Rico law by confiscating and later killing the Plaintiffs' pets.

11.4    Such actions, omissions and conspiracy among the Defendants are the proximate cause of the damages complained of herein and damages resulting from such actions and omissions were reasonably foreseeable.

11.5    Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## XII.    SEVENTH CAUSE OF ACTION

12.1    The foregoing allegations are repeated and alleged herein.

12.2    This Cause of Action arises under the Puerto Rico tort statutes. Articles 1802 and 1803 of Civil Code (31 LPRA §§ 5141 and 5142).

12.3    Defendants individually and through its agents and employees, subjected the Plaintiffs to harassment, persecution, intimidation breach of the peace and other extreme and outrageous conduct with the intent to cause, or reckless disregard of the probability of causing, Plaintiff to suffer emotional distress.

12.4    Defendants had a duty towards the Plaintiffs and their pets and the conduct as described herein where Plaintiffs' pets were subjected to wanton acts of cruelty and abuse by injecting them with unknown substances, slamming them against vehicle panels, conduct which shows a callous and reckless disregard for animals' rights to be treated in a humane manner has greatly affected the Plaintiff.

12.5    Defendants' conduct culminating with the plunging of small dogs and cats to their deaths shows a cold and depraved heart; behavior specifically proscribed by statutes and in

contravention of the Commonwealth's public policy.  5 L.P.R.A. § 1652 (Acts of cruelty generally).

12.6    The foregoing conduct caused Plaintiffs' to suffer severe mental, psychological moral and emotional pain, anguish and distress; and, to sustain a loss of happiness and the capacity to enjoy life, a diminishment of the capacity to love, and an impairment of the capacity to perform the activities common to a activities normal for their ages.

12.7    Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## XIII.  EIGHT CAUSE OF ACTION

13.1    The foregoing allegations are repeated and alleged herein.

13.2    This Cause of Action arises under provisions of the Commonwealth's Constitution's Bill of Rights.

13.3    Defendants individually and through its agents and employees, subjected Plaintiffs to harassment, persecution, intimidation breach of the peace and other extreme and outrageous conduct with the intent to cause, or reckless disregard of the probability of causing, Plaintiff to suffer emotional distress and infringing on their of right human dignity and equality.  Article II Section *One*, Puerto Rico Constitution (Human dignity and equality; discrimination prohibited).

13.4    The foregoing conduct caused Plaintiffs' to suffer severe mental, psychological moral and emotional pain, anguish and distress; and, to sustain a loss of happiness and the capacity to enjoy life, a diminishment of the capacity to love, and an impairment of the capacity to perform the activities common to a activities normal for their ages.

13.5    Plaintiffs requests any additional remedy, equitable or compensatory, to which they

me be entitled to be law or in equity.

13.6    As consequence of the aforementioned illegal activity and practices and the resultant mental damages suffered by Plaintiffs, they have been and will continue to be in the future.

## XIV.    NINTH CAUSE OF ACTION

14.1    The foregoing allegations are repeated and alleged herein.

14.2    This Cause of Action arises under provisions of the Commonwealth's Constitution's Bill of Rights.

14.3    Defendants individually and through its agents and employees, subjected Plaintiffs to harassment, persecution, intimidation breach of the peace and other extreme and outrageous conduct with the intent to cause, or reckless disregard of the probability of causing, Plaintiffs to suffer emotional distress and infringing on their right to liberty and enjoyment of property due process and for the petition for redress of grievances.  Article II Section *Four*, Puerto Rico Constitution (Freedom of speech and press; peaceful assembly; petition for redress of grievances).

14.4    The foregoing conduct caused Plaintiffs' to suffer severe mental, psychological moral and emotional pain, anguish and distress; and, to sustain a loss of happiness and the capacity to enjoy life, a diminishment of the capacity to love, and an impairment of the capacity to perform the activities common to a activities normal for their ages.

14.5    Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## XV.    TENTH CAUSE OF ACTION

15.1    The foregoing allegations are repeated and alleged herein.

15.2    This Cause of Action arises under provisions of the Commonwealth's Constitution's Bill of Rights.

15.3    Defendants individually and through its agents and employees, subjected Plaintiffs to harassment, persecution, intimidation breach of the peace and other extreme and outrageous conduct with the intent to cause, or reckless disregard of the probability of causing, Plaintiff to suffer emotional distress resulting from their deprivation of Plaintiffs' property without due process violation of Plaintiffs' equal protection of laws and exemption of property from attachment. Article II Section *Seven*, Puerto Rico Constitution (Right to life, liberty, and enjoyment of property; no death penalty; due process; equal protection of laws; impairment of contracts; exemption of property from attachment).

15.4    Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## XVI.    ELEVENTH CAUSE OF ACTION

16.1    The foregoing allegations are repeated and alleged herein.

16.2    This Cause of Action arises under provisions of the Commonwealth's Constitution's Bill of Rights.

16.3    Defendants, individually and  through its agents and employees, subjected the Plaintiffs to harassment, persecution, intimidation breach of the peace and other extreme and outrageous conduct with the intent to cause, or reckless disregard of the probability of causing, Plaintiffs to suffer emotional distress resulting from Defendants' invasion of Plaintiffs' privacy. Article II Section *Eight*, Puerto Rico Constitution (Protection against attacks on honor, reputation, and

private life).

16.4    Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## XVII. TWELFTH CAUSE OF ACTION

17.1    The foregoing allegations are repeated and alleged herein.

17.2    This Cause of Action arises under provisions of the Commonwealth's Constitution's Bill of Rights.

17.3    Defendants individually and through its agents and employees, subjected Plaintiffs to harassment, persecution, intimidation breach of the peace, searches and seizures and other extreme and outrageous conduct with the intent to cause, or reckless disregard of the probability of causing, Plaintiffs to suffer emotional distress resulting from Defendants' actions.  Article II Section *Ten*, Puerto Rico Constitution (Searches and seizures; wire-tapping; warrants).

17.4    Plaintiffs requests any additional remedy, equitable or compensatory, to which they me be entitled to be law or in equity.

## XVIII.        PRAYER FOR RELIEF

**WHEREFORE,** it is respectfully requested that Judgment be entered by this Honorable Court in favor of the Plaintiff and against Defendants:

a.    granting the Plaintiff all the sums and remedies requested in the complaint, specifically an amount not less than FIVE HUNDRED THOUSAND DOLLARS for each Plaintiff as compensatory damages.

b.      granting the Plaintiff all the sums and remedies requested in the complaint, specifically an amount not less than ONE THOUSAND FIVE HUNDRED DOLLARS for each Plaintiff for the value of their pets.

c.      the issuance of a declaratory judgment finding the Defendants conduct illegal;

d.      the issuance of a permanent injunction barring the Defendants abject violations of the Plaintiffs' civil rights and protection of animals;

e.      imposing upon the Defendants the payment of all costs and expenses to be incurred in this lawsuit;

f.      imposing upon the Defendants the payment of Attorneys Fees under 42 USC § 1988 and any other applicable statute.

g.      awarding the Plaintiff pre-judgment and post-judgment interests

h.      granting the Plaintiffs punitive damages and/or any other relief that she may be entitled to as a matter of law.

WHEREFORE, it is respectfully requested that this Court find in favor of Plaintiffs and against the Defendant and that they be ordered to compensate each one for the damages sustained in an amounts stated herein as itemized in the Complaint.  In addition it is requested that Plaintiffs be awarded pre-judgment interest, cost and reasonable attorney fees and that this Honorable Court grant the Plaintiffs such further relief as is just and proper.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, on this 19th day of December, 2007.

PEDRO R. VÁZQUEZ, ESQ.                    MARÍA S. KORTRIGHT SOLER, ESQ.

**S:/PEDRO R. VÁZQUEZ, ESQ**.            **S:/MARÍA S. KORTRIGHT SOLER, ESQ**.

USDC Bar No. 216311                      USDC PR No. 127310

405 Esmeralda Ave., Suite 2              P.O. Box 360156

Guaynabo, Puerto Rico 00969              San Juan, Puerto Rico 00936-0156

Tel.: (787) 925-4669                     Tel.: (787) 756-8571

Fax: (787) 754-0331                      Fax: (787) 754-0331