IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MADELINE MALDONADO, et al.,

Plaintiffs

v.                                                    CIVIL 07-1992 (JAG)

THE MUNICIPALITY OF
BARCELONETA, et al.,

Defendants

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

I.  Facts

On October 1, 2007, the Municipality of Barceloneta ("the Municipality") acquired the right to operate and manage Barceloneta's public housing communities.  (Docket No. 36, at 6, ¶ 1.2.)  On October 2, 2007 the Municipality established a policy which required residents of the public housing communities to surrender any domestic pets kept in their homes, or face eviction.  (Id. at 17, ¶ 4.36, ¶ 4.37.)  Between October 3, 2007, and October 7, 2007, a memorandum was sent to all residents of the public housing communities informing them of the policy.  (Id. at 17-18, ¶ 4.37, ¶ 4.39.)  The memorandum further informed the residents that Animal Control Solutions Inc. ("ACS") had been hired to pick up the animals.  (Id. ¶ 4.37)  The letter was written in English, a language the majority of the plaintiffs do not speak or read.  (Id. at 17-18, ¶ 4.37.)

CIVIL 07-1992 (JAG)                    2

On Monday October 8, 2007, ACS employees and personnel from The Municipality conducted raids on three public housing developments.  (Id. at 18, ¶¶ 4.40-4.42.)  During the raids ACS agents and municipal personnel went house to house instructing residents that if they did not hand over their pets eviction proceedings would begin immediately.  (Id. at 18-19, ¶ 4.43.)  ACS agents and municipal personnel entered plaintiffs' houses, took pets from children, opened doors to laundry areas, and entered enclosed patio areas of vacant homes.  (Id. at 19, ¶ 4.44.)  Pets were indiscriminately taken without establishing who the owners were.  (Id.)  The captured animals were injected with a tranquillizer, and slammed inside a van.  (Id. ¶¶ 4.45 & 4.46.)  The animals were then taken to a fifty to sixty foot bridge commonly known as "El Paseo del Indio" where they were thrown from the bridge to their deaths.  (Id. at 6, ¶ 1.5.)

Two days later, on October 10, 2007 a similar raid was conducted in the housing communities.  (Id. at 20, ¶ 4.51.)  Once again pets were taken from their owners, tranquilized, slammed into vehicle panels, and then thrown from "El Paseo del Indio".  (Id. at 7, ¶ 1.7.)

The plaintiffs filed their second amended complaint on March 10, 2008.  (Docket No. 36.)  The complaint was filed against numerous defendants including municipal actors, ACS, including defendant Mr. Julio Díaz.  Plaintiffs base their Title 42 U.S.C. Sections 1983, 1985 and 1986 claims on alleged violations of their

CIVIL 07-1992 (JAG)                3

Fourth, Fifth, Fourteenth Amendment rights.   In addition, plaintiffs' allege violations of sections one, four, seven, eight and ten of the Puerto Rico constitution as well as articles 1802 and 1803 of the Civil Code of Puerto Rico and other state laws.  Plaintiffs are seeking compensatory and punitive damages, the value of their pets, pre-judgment and post-judgment interests, costs, attorney's fees, declaratory judgment and a permanent injunction.  (Docket 36, at 59-60.)

Plaintiffs contend that defendant Julio Díaz is liable for his actions and omissions in the training, support, encouragement and supervision of the ACS employees who were involved and participated in the raids.  (Docket No. 36, at 11-12, ¶ 3.11.)  Plaintiffs allege that Díaz' actions and omissions were done within the scope of his work for the municipality, totally intertwined with government action, and vested with government authority.  (Id.)  As such plaintiffs assert that Díaz was acting under color of law throughout his involvement in the raids.  (Id.)

Plaintiffs claim that Díaz actively participated in the raids through his role as president of ACS.  (Id. at 16-17, ¶ 4.32.)  Specifically plaintiffs allege that Díaz gave direct orders to ACS personnel prior to and during the raids.  (Id.)  Plaintiffs stress that the defendants never had the authorization of any plaintiff to take their property.  (Id. at 21, ¶ 4.60.)  The plaintiffs further assert that Díaz acted with the intent of depriving the plaintiffs of their pets by killing them either through the administration of chemicals or hurling them from a bridge.  (Id. ¶ 4.59.)

CIVIL 07-1992 (JAG)                    4

On May, 20, 2009 defendant Julio Díaz filed a motion for summary judgment and/or motion to dismiss.  (Docket No. 176.)  In the motion Díaz argues that he is not liable in his personal capacity for the raids.  In support of this Díaz first avers that he was not a party to the contract which arranged for the removal of the plaintiffs' pets.  (Id. at 6.)  Second, Díaz offers that he was not present during the collection of the dogs in Barceloneta.  (Id. at 7-9.)  However, Díaz does admit to handling the animals at the euthanasia stage.  (Id.)

The motion for summary judgment/motion to dismiss goes on to state that the individuals who participated in the raids were employees of ACS and not of Díaz in his personal capacity.  (Id. at 9.)  Further, Díaz states that he is not an agent of the municipality and denies being cloaked with the police power of the state.  (Id. at 10.)  Finally, Diaz asks the court to reward him costs and attorneys fees.  (Id. at 11.)

On June 14, 2009 Plaintiffs' filled a memorandum in opposition to defendant's motion to dismiss.  (Docket No. 204).  In the memorandum the plaintiffs state that the taking and killing of pets is one of the pillars of their complaint, specifically the deprivation of their pets without due process of law.  (Id. at 2.)  Based on this plaintiffs argue that Díaz' involvement in the euthanasia of the dogs is an admission of direct participation in the events that give rise to the complaint.  (Id. at 7-8)

CIVIL 07-1992 (JAG)                          5

## II.  Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of an action for "failure to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (U.S. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 569 (U.S. 2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  Determining if a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 1950.

Further, "[i]n ruling upon a [Federal] Rule [of Civil Procedure] 12(b)(6) motion, the court must accept as true all the well-pleaded factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff. Marrero-Gutiérrez v. Molina, 447 F. Supp. 2d 168, 172 (D.P.R. 2006) (citing Perry v. New England Bus. Serv., Inc., 347 F.3d 343, 344 (1st Cir. 2003)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements

CIVIL 07-1992 (JAG)                         6

of a cause of action, supported by mere conclusory statements, do not suffice."
Ashcroft v. Iqbal, 129 S. Ct. at 1949 (citing Bell Atl. Corp. v. Twombly, 550 U.S.
at 555).  In a situation "where the well-pleaded facts do not permit the court to
infer more than the mere possibility of misconduct, the complaint has alleged-but
it has not 'show[n]' - 'that the pleader is entitled to relief.'"  Id. at 1950 (quoting
Fed. Rule Civ. Proc. 8(a)(2)).

### III.  Discussion

### i. 42 U.S.C. § 1983

When analyzing a section 1983 claim the court must determine "(1) whether
the conduct complained of was committed by a person acting under the color of
state law; and (2) whether this conduct deprived a person of rights, privileges, or
immunities secured by the Constitution or laws of the United States."
Gutiérrez-Rodríguez v. Cartagena, 882 F.2d 553, 559 (1st Cir. 1989) (quoting
Parratt v. Taylor, 451 U.S. 527, 535 (1981)), overruled on other grounds by
Davidson v. Cannon, 474 U.S. 344, 347 (1986).

### 1.  Under Color of State Law

By the traditional definition, acting under color of state law "requires that
the defendant in a § 1983 action have exercised power 'possessed by virtue of
state law and made possible only because the wrongdoer is clothed with the
authority of state law.'"  West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United

CIVIL 07-1992 (JAG)                    7

States v. Classic, 313 U.S. 299, 326 (1941)).  However, "[i]n *Lugar v. Edmondson Oil Co.*, . . . the Court made clear that if a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, 'that conduct [is] also action under color of state law and will support a suit under § 1983.'" Id. (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 928 (1982)).

The state action requirement ensures that the "conduct allegedly causing the deprivation of a federal right be fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. at 937.  Requiring attribution to the state both preserves individual freedom and prevents a state, its agencies, or officials from being held responsible for conduct for which they cannot fairly be blamed. Id. at 936.

A two part approach is used to determine if conduct can be fairly attributed to the state. Id. at 937.  The first part of the approach requires "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Id.

The plaintiffs allege that the municipality's policy which was established on October 2, 2007 required all of the public housing residents to surrender their pets.  (Docket No. 36, at 17, ¶ 4.36, ¶ 4.37.)  Taking this assertion as true, the policy created the right or privilege for the plaintiffs' pets to be taken.

CIVIL 07-1992 (JAG)                          8

Consequently, sufficient factual allegations have been made for the first component of the test to be satisfied for the purposes of this motion.

The second component of the approach requires that "the party charged with the deprivation must be a person who may fairly be said to be a state actor." Lugar v. Edmondson Oil Co., 457 U.S. at 937.  A private party can be found to be a state actor if it meets one of three tests:  "the public function test, the joint action/nexus test, or the state compulsion test." Alberto San, Inc. v. Consejo de Titulares del Condominio San Alberto, 522 F.3d 1, 4 (1st Cir. 2008) (citing Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 5 (1st Cir. 2005)).

In determining whether a party can fairly be said to be a state actor under the joint action/nexus test the Supreme Court has stated that "a private party's joint participation with state officials in the seizure of disputed property is sufficient . . . for purposes of the Fourteenth Amendment." Lugar v. Edmondson Oil Co., 457 U.S. at 941.

The plaintiffs allege that Díaz was acting in concert with the State to obtain and terminate their pets.  This assertion is supported by the factual allegation that Díaz' company, ACS, was hired by the Municipality to pick up the pets.  (Docket No. 36, at 16-17, ¶ 4.32.)   Further, it is alleged that Díaz gave support, encouragement and direct orders to ACS personnel prior to, and during the raids.

CIVIL 07-1992 (JAG)                    9

(Id.)   The plaintiffs also claim that throughout the raids agents from the Municipality and the Mayor acted alongside ACS personnel.  (Id. at 18-19, ¶¶ 4.40-4.43.)   Further, Díaz admits to having euthanized some of the plaintiffs' dogs.  (Docket No. 176, at 8.)  Based on these factual allegations a reasonable inference can be drawn that Díaz and the state were jointly engaged in the seizure of the plaintiffs' pets.[1]  Therefore, Díaz can be fairly said to be a state actor for purposes of this motion.[2]   Because Díaz' conduct satisfies the state action requirement it is also considered action under color of state law.

　　　2.   Depravation of Rights, Privileges, or Immunities Secured by the Constitution or Laws of the United States

　　　In regard to the second inquiry of a 1983 claim "(1) there must have been a *deprivation* of federally protected rights, privileges or immunities, and (2) the conduct complained of must have been *causally connected* to the deprivation."  Gutiérrez-Rodríguez v. Cartagena, 882 F.2d at 559 (quoting Woodley v. Town of Nantucket, 645 F. Supp. 1365, 1369 n.4 (D. Mass. 1986)).  The plaintiffs allege that Díaz' actions resulted in a depravation of their Fourth, Fifth, and Fourteenth amendment rights.

---

　　　[1]For the purposes of the Fourteenth Amendment the plaintiffs' pets are protected as property.  Maldonado v. Fontanés, 568 F.3d 263, 270-73 (1st Cir. 2009).

　　　[2]Since Diaz' conduct qualifies as state action under the joint action test I will not address the state compulsion or the public function tests.

CIVIL 07-1992 (JAG)                    10

A.  Fourth Amendment Rights

The Fourth Amendment of the Constitution of the United States declares "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.[3]

An individual's pet qualifies as an effect for the purposes of the Fourth Amendment, and therefore is protected against unreasonable searches and seizures.  Maldonado v. Fontanés, 568 F.3d at 271.  Further, "[t]he killing of a person's pet dog or cat by the government without the person's consent is also a seizure within the meaning of the Fourth Amendment."  Id. (citing Brown v. Muhlenberg Twp., 269 F.3d 205, 210 (3d Cir. 2001); Fuller v. Vines, 36 F.3d 65, 68 (9th Cir. 1994), overruled on other grounds by Robinson v. Solano County, 278 F.3d 1007 (9th Cir. 2002); Lesher v. Reed, 12 F.3d 148, 150-51 (8th Cir. 1994); see Viilo v. Eyre, 547 F.3d 707, 710 (7th Cir. 2008)).  Therefore, confiscating and killing the plaintiffs' pets constitutes a seizure of their effects under the Fourth Amendment.

---

[3]The Fourth Amendment applies to the states and Puerto Rico through the Fourteenth Amendment.  Mapp v. Ohio, 367 U.S. 643, 655 (1961); Martínez-Rivera v. Sánchez-Ramos, 498 F.3d 3, 7 n.4 (1st Cir. 2007).

CIVIL 07-1992 (JAG)                    11

The Fourth Amendment only protects against "unreasonable" seizures. U.S. Const. amend. IV.   Determining whether a particular seizure was unreasonable under the Fourth Amendment requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985) (quoting United States v. Place, 462 U.S. 696, 703 (1983)).   Further, when analyzing reasonableness the Court must determine if the actions were "'objectively reasonable' in light of the facts and circumstances . . . without regard to their underlying intent or motivation." Id. (citing Scott v. United States, 436 U.S. 128, 137-39 (1978)).

In this case the alleged intrusion upon the plaintiffs' Fourth Amendment interests occurred when their pets were seized during the two raids.  The plaintiffs allege that their pets were taken with little notice, leaving them without the opportunity to find alternative placements.  It is also alleged that the plaintiffs were not given the opportunity to object or refute the municipality's policy before their pets were taken.   The plaintiffs also maintain that the defendants indiscriminately grabbed pets, injected them with tranquilizers, and slammed them inside a van.  (Docket 36, at 19, ¶¶ 4.44-4.46.)  Further, the plaintiffs claim that the defendants entered their houses, took pets from children, opened doors

CIVIL 07-1992 (JAG)                    12

to laundry areas, and entered enclosed patio areas of vacant homes.  (Id.)  It is asserted that the pets collected during the raids were later killed by being thrown off of a bridge.  (Id. at 6, ¶ 1.5.)  The plaintiffs have made sufficient factual allegations to allow a reasonable inference that the seizure of their pets was objectively unreasonable and in violation of their Fourth Amendment rights.

I now analyze whether Diaz' conduct is causally connected to the deprivation.  "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury."  Gutiérrez-Rodríguez v. Cartagena, 882 F.2d at 561 (citing Springer v. Seaman, 821 F.2d 871, 879 (1st Cir. 1987)).

In order to establish a causal connection, the plaintiffs claim that Díaz caused their Fourth Amendment rights to be violated through his "actions and omissions in the training, support, encouragement and supervision of [ACS] employees . . . . " (Docket No. 36, at 11, ¶ 3.11.)  Specifically, the plaintiffs allege that as president of ACS, Díaz ordered ACS employees to carry out the October 8, 2007 and October 10, 2007 raids.  (Id. at 17 ,¶ 4.32.)  The plaintiffs also point to Díaz' statement that he participated in euthanizing some of the animals which were captured during the raids.  (Docket No. 176, at 8.)

CIVIL 07-1992 (JAG)                    13

It is plausible that by ordering his employees to partake in the two raids, Díaz set in motion a series of acts which he knew would lead to the seizure and killing of the plaintiffs' pets.  Further, Díaz' involvement in euthanizing some of the animals constitutes direct involvement in the seizure.   Taking the factual allegations as true, a reasonable inference can be drawn that Díaz' conduct is causally connected to the violation of the plaintiffs' Fourth Amendment rights. Consequently, Díaz' motion for dismissal of the plaintiffs' 1983 claim based on the Fourth Amendment should be denied.

B.  Fourteenth Amendment Rights

The plaintiffs have also claimed that their rights under the Fourteenth Amendment have been violated.  The due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . . . " U.S. Const. amend. XIV, § 1.  The plaintiffs allege that their due process rights have been violated both procedurally and substantively.

For the plaintiffs to succeed in a procedural due process claim it must be found that they were deprived of a property interest without a constitutionally adequate process.  Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982); PFZ Props., Inc. v. Rodríguez, 928 F.2d 28, 30 (1st Cir. 1991).  In order to determine what constitutes a constitutionally adequate process in a particular case several factors are considered.

CIVIL 07-1992 (JAG)                    14

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 335 (1976) (citing Goldberg v. Kelly, 397 U.S. 254, 263-71 (1970)).

Regardless of what the Court determines to be a constitutionally adequate process "(i)n situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." Zinermon v. Burch, 494 U.S. 113, 132 (1990) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985); Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 18 (1978)).

In this case the private interest effected by the official action was the plaintiffs' property interest in their pets. It is alleged that during the two raids pets were indiscriminately taken without establishing who the owners were. Thus, a reasonable inference can be made that the pets were seized in a manner which ran a high risk of erroneous deprivation. Further, the pets were immediately killed following the raids making any erroneous deprivations irreversible. There is no apparent fiscal or administrative burden which demanded the raids be

CIVIL 07-1992 (JAG)                    15

conducted without time for pre-deprivation hearings, or at least adequate time to challenge the municipality's policy.

The only semblance of due process the plaintiffs received is a letter prior to the raids.  (Docket No. 36, at 17 ¶ 4.37.)  However, even if notice alone were to be considered satisfactory due process the notice given in this case would still be found to be deficient.  "[T]he right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'"  Fuentes v. Shevin, 407 U.S. 67, 80 (1972) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  This is so because, "[i]f the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented."  Id. at 81.

The plaintiffs allege that the letter they received was written in English, a language the majority of the defendants do not speak or read.  (Docket. No. 36, at 18, ¶ 4.37.)  A reasonable inference can be made that a letter in a foreign language does not provide notice in a meaningful manner.  The plaintiffs also assert that the residents received the letter only one to five days before the first raid.  (Id. ¶ 4.39.)  A reasonable inference can be made that one to five days was not adequate time to allow the plaintiffs to prevent the deprivation of their property.  Therefore, it is plausible that the notice provided by the defendants was not granted at a meaningful time.  Consequently, the plaintiffs allege sufficient

CIVIL 07-1992 (JAG)                    16

facts to allow a reasonable inference that they did not receive a constitutionally adequate process prior to the depravation of their property.  It is plausible that the plaintiffs' Due Process rights under the Fourteenth Amendment were violated.

Next I consider whether Díaz' conduct is causally connected to the deprivation of the plaintiffs' Fourteenth Amendment rights.  The plaintiffs make no allegations that Díaz made the decision when the raids were to take place or what notice should be given.  However, they do assert that Díaz ordered ACS employees to seize and kill their pets.  In order for a supervisor to be liable for the actions of his employees under a 1983 claim, the plaintiff must show an "affirmative link between the subordinate officer and the supervisor, whether through direct participation or through conduct that amounts to condonation or tacit authorization." Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145, 156 (1st Cir. 2006) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Taking the plaintiffs' assertions as true, it is clear that Díaz' direct orders amount to tacit authorization for his employees to seize and kill the plaintiffs' pets.  Based on Díaz' orders to ACS employees, and his direct participation in euthanizing the plaintiffs' pets, a reasonable inference can be made that his actions were causally connected to the infringement on the plaintiffs' procedural due process rights.  Accordingly, Díaz' motion for dismissal as to the plaintiffs' Fourteenth Amendment procedural due process claim should be denied.

CIVIL 07-1992 (JAG)                    17

The plaintiffs also allege that their substantive due process rights were violated by Díaz.  In order to support a finding that their substantive due process rights were violated, plaintiffs "have to prove that they suffered [a] deprivation of an established life, liberty, or property interest, and that such deprivation occurred through governmental action that shocks the conscience."  Clark v. Boscher, 514 F.3d 107, 112-13 (1st Cir. 2008) (citing Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006); Rivera v. Rhode Island, 402 F.3d 27, 33-34 (1st Cir. 2005)).  Substantive Due Process protects individuals from "particularly offensive actions on the part of government officials . . . . "  Pagán v. Calderón, 448 F.3d at 32.

There is no scientifically precise formula used to determine when a depravation of an established right is "sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment."  Id. (citing Nestor Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992)).  The inquiry must be done on a case by case basis and involves "a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking."  Id. (quoting DePoutot v. Raffaelly, 424 F.3d 112, 119 (1st Cir. 2005)).  To be conscience shocking the action must be "truly outrageous, uncivilized, and intolerable . . . . "  Id. (quoting Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999)); see Estate of Radamés

CIVIL 07-1992 (JAG)                            18

Tejada v. Flores, 596 F. Supp. 2d 205, 220 (D.P.R. 2009).   Further, '[m]ere

violations of state law, even violations resulting from bad faith,' do not invariably

amount to conscience-shocking behavior." Id. (quoting DePoutot v. Raffaelly, 424

F.3d at 119).

     In this case the plaintiffs were denied their property interest in their pets.

This deprivation was carried out in a manner which could reasonably be found to

shock the conscience.   There are no immediately obvious attendant circumstances

in this case which warrant the alleged behavior.   Further, it is plausible that the

behavior was outrageous, uncivilized and intolerable.   Thus, the plaintiffs have

made sufficient factual allegations to allow a reasonable inference that their

property rights were denied in a conscience shocking manner, and in turn in

violation of the Fourteenth Amendment.

     I now analyze whether Díaz' conduct is causally connected to the deprivation

of their rights.   The plaintiffs allege that Díaz is liable based on his actions and

omissions in the training, support, encouragement and supervision of ACS

employees. (Docket No. 36, at 11-12, ¶ 3.11.)   However, the plaintiffs offer no

further allegations to show that ACS training procedures were inadequate, or that

Díaz encouraged his employees to partake in the conscience shocking activities

which allegedly took place during the raids.   These allegations therefore are the

type of "[t]hreadbare recitals of the elements of a cause of action, supported by

CIVIL 07-1992 (JAG)                    19

mere conclusory statements . . . . " which the court does not have to accept as true.  Ashcroft v. Iqbal, 129 S. Ct. at 1949.

Further the plaintiffs make no allegations that Díaz authorized any shocking conduct.   As previously discussed without an affirmative link between a subordinate employee and a supervisor, a supervisor cannot be held liable for the actions of his employees under a 1983 claim.  The plaintiffs have failed to make sufficient allegations to infer that Díaz condoned or tacitly authorized ACS employees to engage in any conscience shocking behavior.   Therefore, Díaz cannot be held liable for the conscience shocking behavior of ACS employees that took place during the raids.

Díaz is liable however for his personal actions; ". . . those individuals who participated in the conduct that deprived the plaintiff of his rights can be held liable." Vélez-Rivera  437 F.3d at 156 (citing Cepero-Rivera v. Fagundo, 414 F.3d 124, 128 (1st Cir. 2005)).  The plaintiffs allege that Díaz ordered his employees to participate in the raids, and participated directly in euthanizing some of the animals in a clinic.  This behavior does not allow a reasonable inference that Díaz' actions were "outrageous, uncivilized, or intolerable."  In turn it is not plausible that Díaz' behavior was sufficiently shocking to trigger the protections of the substantive due process clause.  Consequently, the plaintiffs have failed to provide sufficient factual allegations to make it plausible that Díaz is liable for the violation

CIVIL 07-1992 (JAG)                    20

of their substantive due process rights.  Thus, the substantive due process claim

against Díaz should be dismissed.

C.  Fifth Amendment Rights

The plaintiffs claim that their Fifth Amendment rights were violated.  The

Fifth Amendment states in relevant part that "No person shall be . . . deprived of

life, liberty, or property, without due process of law . . . . "  U.S. Const. amend.

5.  The Fifth Amendment applies only to actions of the federal government.  Pub.

Utils. Comm'n v. Pollak, 343 U.S. 451, 461 (1952); see also Gerena v. P.R. Legal

Servs., Inc., 697 F.2d 447, 448 (1st Cir. 1983).

Only state officials are named defendants.  There is no federal government

action.  The Fifth Amendment is inapplicable.  Plaintiffs' Fifth Amendment claims

against Díaz must be dismissed.

ii.  Section 1985 and Section 1986 Claims

The plaintiffs claim that the defendants conspired to deprive them of their

pets because they lived in low income housing, and were from a low economic

class.  Title 42, United States Code, section 1985(3), protects persons from

conspiracies that would deprive that person or any class of persons of their

Constitutional rights.  42 U.S.C. § 1985(3).  In order to state a claim under

section 1985(3)

> a plaintiff must allege the existence of (1) a conspiracy,
> (2) a conspiratorial purpose to deprive a person or class

CIVIL 07-1992 (JAG)                    21

> of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege.

Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996) (citing Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).  Additionally, the Supreme Court has held that the statute requires that "the conspiratorial conduct of which [the plaintiff] complains is propelled by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'"  Id. (quoting Griffin v. Breckenridge, 403 U.S. at 102).

The plaintiffs allege that they were discriminated against based on their economic class.  However, the Supreme Court has declined to "construe § 1985(3) to reach conspiracies motivated by economic or commercial animus . . . group actions generally resting on economic motivations should be deemed beyond the reach of § 1985(3)."  United Bhd. of Carpenters & Joiners, Local 610 v. Scott, 463 U.S. 825, 838-39 (1983).  Further, the plaintiffs offer no factual allegations to support a valid claim of class or race based animus.  Consequently, the plaintiffs' 1985 claim should be dismissed.

The plaintiffs also filed a 42 U.S.C. § 1986 claim.  Title 42 U.S.C. § 1986 provides a cause of action against

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having

CIVIL 07-1992 (JAG)                    22

> power to prevent or aid in preventing the commission of
> the same, neglects or refuses so to do, if such wrongful
> act be committed . . . .

42 U.S.C. § 1986.  Since the plaintiffs' section 1985 action should be dismissed,

their claim under section 1986 should also be dismissed.

IV.  Conclusion

It is recommended that Díaz' motion to dismiss be GRANTED as to the Fifth

Amendment, Fourteenth Amendment substantive due process, and sections 1985

and 1986 claims against him and DENIED as to the Fourth Amendment Claim and

the Fourteenth Amendment procedural due process claim.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any

party who objects to this report and recommendation must file a written objection

thereto with the Clerk of this Court within ten (10) days of the party's receipt of

this report and recommendation.  The written objections must specifically identify

the portion of the recommendation, or report to which objection is made and the

basis for such objections.  Failure to comply with this rule precludes further

appellate review.  See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v.

Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun.

Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health &

Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14

CIVIL 07-1992 (JAG)                    23

(1st Cir. 1983); <u>United States v. Vega</u>, 678 F.2d 376, 378-79 (1st Cir. 1982);

<u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this  day 12th day of November, 2009.

S/ JUSTO ARENAS
Chief United States Magistrate Judge