IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MADELINE MALDONADO, et al.,

     **Plaintiff(s)**

       **v.**

MUNICIPALITY OF BARCELONETA, et al.,

     **Defendant(s)**

**CIVIL NO.** 07-1992 (JAG)

## OPINION AND ORDER

GARCIA-GREGORY, D.J.

The twenty-seven named plaintiff families in the case at bar, all residents of three public housing complexes located in Barceloneta, Puerto Rico (collectively "Plaintiffs"), bring a civil rights suit under 42 U.S.C. §§ 1983, 1985, and 1986 against Defendants asserting violations of their rights under the United States Constitution. Specifically, Plaintiffs allege that the precipitous seizure and cruel killings of their pet cats and dogs by Defendants violated their Fourth Amendment rights to be free from the unreasonable seizure of their "effects," and their Fourteenth Amendment substantive and procedural due process rights. Plaintiffs also proffered claims under the Fifth Amendment to the United States Constitution and supplemental law claims under the laws and Constitution of the Commonwealth of Puerto Rico. Plaintiffs are seeking compensatory and punitive damages, costs, attorney's fees, declaratory judgment, injunctive relief, pre-

Civil Case No. 07-1992 (JAG)                                    2

judgment and post-judgment interest, and the value of their pets. (See Docket No. 36).

Plaintiffs' claims under the Fifth Amendment and 42 U.S.C. § 1985 against Defendants the Municipality of Barceloneta ("the Municipality"), Mayor Luis Fontanes ("the Mayor"), Elsa Perez ("Perez"), and the conjugal partnership Fontanes-Perez were dismissed by this Court. (Docket No. 91). Furthermore, the First Circuit ordered the dismissal of Plaintiffs' substantive due process claims under the Fourteenth Amendment. (Docket No. 233). Maldonado v. Fontanes, 568 F.3d 263, 271 (1st Cir. 2009).

Defendants the Mayor, the Municipality ("Defendants I"), Leonides Gonzalez, Sylvia Riquelme, Esther Ruiz, Ahmid Molina Morales and Edgardo Santiago ("Defendants II") (collectively "Defendants") move for summary judgment. (Docket Nos. 182 and 197). For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part Defendants' motions.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties summary judgment pleadings reveal the following uncontested material facts. All of the Plaintiffs' households are located in three public housing developments in the Municipality of Barceloneta. (Docket No. 182-2 at 1, ¶ 1 & Docket No. 214-2 at 1-2, ¶ 1). Of the 85 Plaintiffs, 56 are minor children. (Docket No. 182-2 at 1, ¶ 2 & Docket No. 214-2 at 2, ¶ 2). All of the adult Plaintiffs voluntarily entered into a lease with the responsible

public housing authority. (Docket No. 182-2 at 1, ¶ 3 & Docket No. 214-2 at 2, ¶ 3). The leases stated that the tenants agreed to abide by the Admission and Continued Occupancy Policies of the Public Housing Authority ("PHA"). (Docket No. 182-2 at 1, ¶ 4 & Docket No. 214-2 at 2, ¶ 4).

On October 1, 1999, the United States Congress approved 42 U.S.C. § 1437z-3, a public health and welfare law that allowed public housing residents to own and have in their dwelling one or more household pets. (Docket No. 214-2 at 38, ¶ 1 & Docket No. 230-2 at 3, ¶ 4). Title 24 C.F.R. § 960.707 allows a public housing resident to own one or more common household pet or have one or more household pet present in the dwelling of such resident, subject to reasonable requirements of PHA. (Docket No. 214-2 at 38, ¶ 2 & Docket No. 230-2 at 3, ¶ 4). In the year 2000, the Municipality of Barceloneta passed Ordinance No. 33, which did not allow residents to have pets in urbanizations, the town center, and in housing developments. (Docket No. 214-2 at 38, ¶ 3 & Docket No. 230-2 at 3, ¶ 4).

From 2003 to 2006, the Puerto Rico Public Housing Authority ("PRPHA") submitted to the United States Department and Housing Development ("HUD") an Annual Plan, and their Five Year Plan, which contained the policies under which they work. (Docket No. 214-2 at 39, ¶ 4 & Docket No. 230-2 at 3, ¶ 4). The Annual Plan is the document that the PHA submits to HUD under 24 C.F.R. § 903.4. (Docket No. 214-2 at 39, ¶ 5 & Docket No. 230-2 at 3, ¶ 4). The

2007 Annual Plan and the Five Year Plan was approved by HUD on June 25, 2007, and is in effect as of July 1, 2007. (Docket No. 214-2 at 39, ¶ 6 & Docket No. 230-2 at 3, ¶ 5). In 2007, PRPHA approved a pet policy consistent with the federal laws and regulations that allowed public housing residents to have pets. (Docket No. 214-2 at 39, ¶ 7 & Docket No. 230-2 at 3, ¶ 5). PRPHA's policy (hereinafter referred to as the "2007 Pet Policy") provided that "[p]et ownership shall be limited to common household pets, which shall be defined to include only dogs, cats, caged birds, commonly kept as pets, tropical fish, frogs, iguanas and turtles kept in aquariums, other small caged animals, and no other species of animal; the pets must be registered with PRPHA or Management Agents." (Docket No. 214-13, Exh. 7 at 5 ¶ C). In September 2007, the PRPHA provided training to the Municipalities, including the Municipality of Barceloneta, on the management of public housing under federal laws and regulations. (Docket No. 214-2 at 39, ¶ 9 & Docket No. 230-2 at 4, ¶ 3).

On October 1, 2007, the Municipality of Barceloneta began to manage the three public housing complexes where Plaintiffs reside. (Docket No. 214-2 at 44, ¶ 24 & Docket No. 230-2 at 5, ¶ 5). In doing so, the Municipality of Barceloneta agreed to comply with the PRPHA's formally adopted policies for grievance procedures and hearings (formal or informal) and any other required procedure in compliance with 24 C.F.R. § 966, subpart B and any other federal or state regulation. (Docket No. 214-2 at 40, ¶ 11; Docket No. 214-16,

Civil Case No. 07-1992 (JAG)                                             5

Exh. 10A at 11-12 ¶ 8.4 & Docket No. 230-2 at 4, ¶ 4). On October 2, 2007, the Municipality of Barceloneta, through the administrators of each public housing development, drafted a letter notifying residents of the public housing developments that they could not have pets in their residences and that their lease contracts could be canceled if they did not comply with the prohibition. (Docket No. 214-2 at 44, ¶ 25; Docket No. 214-31, Exh. 20 & Docket No. 230-2 at 5, ¶ 5). The letter was signed by the administrators on October 3, 2007 (hereinafter referred to as "the letter"). (Docket No. 214-2 at 44, ¶ 26; Docket No. 214-31, Exh. 20 & Docket No. 230-2 at 6, ¶ 2).

On October 5, 2007, the Municipality of Barceloneta issued a purchase order to Animal Control Services ("ACS") to collect up to 50 animals. (Docket No. 214-2 at 44, ¶ 28 & Docket No. 230-2 at 6, ¶ 4). From that same day until October 7, the administrators personally delivered the letter to the residents. The letter, however, did not state that officials would enter the housing developments on any date in particular to enforce the prohibition against owning pets. (Docket No. 214-2 at 44, ¶ 27 & Docket No. 230-2 at 6, ¶ 3). On October 8, 2007, the Mayor, along with employees from both the Municipality and ACS, went into each of the public housing communities in order to execute an operation for the pick up of the pets owned by the public housing residents. (Docket No. 214-2 at 45, ¶ 31; Docket No. 230-2 at 7, ¶ 1 & Docket No. 239-3, Exh. 27 at 2-3).

Civil Case No. 07-1992 (JAG)                                    6

Municipal employees asked residents whether they had any pets that needed to be turned over as required by the purported pet policy. (Docket No. 239-2, Exh. 23 at 2). About 50 to 80 animals were seized from the public housing complexes. (Docket No. 214-24, Exh. 30). The animals were injected with a yellowish-green color liquid, after which some of the animals became dazed while others did not move. (Docket No. 214-2 at 49, ¶ 51). All the animals picked up, were put in one van that contained only six to eight plastic crates. (Docket No. 214-2 at 48, ¶ 48). Some of the animals picked up were beaten against the van. (Docket No. 214-2 at 58, ¶ 122).

Thereafter, some of the pets picked up were thrown from a bridge known as "Paseo del Indio." (Docket No. 239-4, Exh. 28 at 2; Docket No. 214-37, Exh. 26 at 15 & 214-2 at 70 ¶ 205). At the bottom of the "Paseo del Indio" Bridge there were many dead dogs and broken tree limbs scattered around. (Docket No. 214-2 at 70, ¶¶ 206 and 207). Also, a dog was found hanging from a tree. (Docket No. 214-2 at 85, ¶ 317; Docket No. 238-6, Exh. 14 at 2).

On October 10, 2007, another operation took place in which pets in possession of public housing residents were taken. (Docket No. 182, Exh. 38 at 48-49). The animals underneath the "Paseo del Indio" Bridge were buried on October 12, 2007. (Docket No. 214-2 at 86, ¶ 321; Docket No. 238-6, Exh. 14 at 3).

On October 17, 2007, the Municipality of Barceloneta fully relinquished its administrative duties to operate the public

Civil Case No. 07-1992 (JAG)                                           7

housing developments. (Docket No. 182-2 at 8, ¶ 45 & Docket No. 214-2 at 37, ¶ 45). Since October 17, 2007, the public housing facilities have not been administered by the Municipality of Barceloneta. (Docket No. 182-2 at 9, ¶ 46 & Docket No. 214-2 at 38, ¶ 46).

On May 29, 2009, Defendants I filed a motion for summary judgment. In their motion, Defendants I argued that Plaintiffs' federal claims against them under the Fourth Amendment and the Fourteenth Amendment's procedural due process clause should be dismissed. Defendants I divide the twenty-seven (27) plaintiff families into four groups. One group is comprised of twelve (12) plaintiff families who allegedly never lost an animal. Defendants I argue that the following plaintiff families lack standing: (1) Carmen Luz Agosto and her children: Priscilla Howard, John Howard, Edwin Howard, and Joshua Lamoutte; (2) Lisette Agosto Roman and her child: Byron Cancel; (3) Daisy Caballero Cruz and her children: Wilfredo de Leon Caballero, Adnersy Rodriguez Caballero, Rafael J. Rodriguez Caballero, and Melquisedec Maisonet Caballero; (4) Evelyn Talavera and her children: Hector and Luis Laureano; (5) Vanessa Gutierrez and her children: Stephanie Moya and Kenneth Escobar; (6) Elba Iris Guzman Reyes; (7) Blanca Iris Medina Cruz and her child: Carla Michelle Colon; (8) Mariyunaira Rivera and her child: Victor Manuel Negro; (9) Andrea Rodriguez Otero and her husband: Feliz de Leon; (10) Jacqueline Santiago Casanova and her child: Kiara Rodriguez Santiago; (11) Evelyn Soler Davila; and (12) Elvia Tirado

Civil Case No. 07-1992 (JAG)                                      8

(collectively referred to as "the Twelve Plaintiff Families").
Another group consists of four (4) plaintiff families who allegedly
delivered their pets to Defendants. The third group includes four
(4) plaintiff families whose pets were allegedly taken from public
areas in the housing projects. The final group is comprised of
seven (7) plaintiff families whose pets were allegedly taken from
the balcony area of their residences.

First, Defendants I submit that the claims proffered by the
Twelve Plaintiff Families should be dismissed because they lack
standing to bring a suit, as they have not lost any animals nor
suffered an intrusion into their homes. Second, Defendants I argue
that the Mayor's acts did not contravene the Fourth Amendment.[1]
According to Defendants I, the Mayor merely knocked on the doors of
Plaintiffs' residences to solicit a consensual conversation with
them regarding their pets. Defendants I stress that the Mayor did
not intrude to any area where Plaintiffs had a reasonable
expectation of privacy. The Mayor concedes that together with the
other Defendants, he had to walk across the balcony areas of the
residences and go up stairs in order to knock on the doors of
Plaintiffs' residences. Defendants I contend that even if
Plaintiffs consider the balcony areas and stairs leading to their

---

[1] The Fourth Amendment, which guards against unreasonable
searches and seizures, states in relevant part that: "The right
of the people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures, shall not be
violated." U.S. Const. amend. IV.

door private areas, such an expectation of privacy is unreasonable.
Third, Defendants I argue that the Fourth Amendment was not
violated because none of the Plaintiffs were "coerced" into giving
their pets, as Defendants engaged in a consensual conversation with
Plaintiffs after which, some handed over their pets, while others
refused to hand over their pets. According to Defendants I, the
Plaintiffs that refused to hand over the pets suffered no negative
consequences. Fourth, Defendants I address the Fourth Amendment
claims of the Plaintiffs whose animals were taken while allegedly
running loose in a public area. Defendants I contend that those
Plaintiffs whose animals were collected from public areas do not
have a Fourth Amendment claim because by letting their animal run
loose they waived any protection they had under the Fourth
Amendment. Moreover, Defendants I submit that the Defendants that
collected the animals running in public areas acted reasonably
because those animals were reasonably deemed to be dangerous or
strays. Fifth, Defendants I argue that those Plaintiffs whose pets
were allegedly taken from the balconies have failed to submit any
evidence beyond their own conjectures that their animals were
located in their balconies. In addition, Defendants I claim that
Plaintiffs lack a reasonable expectation of privacy over the
balconies. Defendants I submit that the balcony areas are comprised
of concrete slabs which are open to the public and fail to create
a barrier that prevents animals from wandering into the public
areas of the housing projects. Sixth, Defendants I argue that even

Civil Case No. 07-1992 (JAG)                                          10

if some of the Defendants' actions constituted an intrusion of an interest protected by the Fourth Amendment, the Defendants' actions were not invasive but administrative in nature and, therefore, did not violate the Fourth Amendment. Seventh, Defendants I contend that the Mayor is entitled to qualified immunity because it is not clearly established that his acts were in violation of the Fourth Amendment. Specifically, the Mayor stresses that his efforts to collect stray animals that threatened the health of the residents of the housing projects, while at the same time offering to collect non-conforming animals kept by the residents, was not in contravention with the rights established by the Fourth Amendment. Eighth, Defendants I aver that Plaintiffs' claims against the Municipality should be dismissed because there was no official policy of the Municipality in place that resulted in or compelled the violation of Plaintiffs' constitutional rights. Ninth, Defendants I allege that Plaintiffs' procedural due process clause claims should be dismissed because the dismissal of Plaintiffs' claims under the Fifth Amendment eliminated the basis for their procedural due process claim. Finally, Defendants I argued that Plaintiffs' request for injunctive relief should be denied because the Municipality of Barceloneta was no longer the administrator of the public housing complexes, rendering Plaintiffs' request moot. (Docket No. 182).

On June 5, 2009, Defendants II submitted their motion for

summary judgement. In their motion, Defendants II first argued that the Fourth Amendment claims against some of them should be dismissed because they did not enter any of the housing units. Second, Defendants II submit that the Fourth Amendment claims based on the alleged unlawful entry of Plaintiffs' residences should be dismissed because the entry into any of the residences occurred after the owner gave consent to enter the residence. Third, Defendants II allege that Plaintiffs have failed to submit a cognizable claim under § 1983 against them because Plaintiffs have failed to show that Defendants II's conduct was causally connected to the alleged deprivation of Plaintiffs' rights under the Fourth Amendment. Additionally, Defendants II allege that there is no cognizable claim under § 1983 because Plaintiffs have failed to show that the raids that occurred in the housing projects violated the Fourth Amendment. Fourth, Defendants II contend that they are entitled to qualified immunity from Plaintiffs' Fourth Amendment claims. (Docket No. 197).

 Plaintiffs opposed Defendants' motions for summary judgement. (Docket Nos. 214 and 224). On July 17, 2009, Defendants II replied to Plaintiffs' opposition. (Docket No. 243). Defendants' motions for summary judgment were referred to a Magistrate Judge for a Report and Recommendation. (Docket No. 242). On November 16, 2009, the Magistrate Judge issued his Report and Recommendation.

 The Magistrate Judge found that the Twelve Plaintiff Families'

claims should be dismissed because they lacked standing. The Magistrate Judge first struck from the record the exhibit in which Defendants I relied on for their proposition that the Twelve Plaintiff Families' did not suffer any damages because they did not lose their pets nor suffered any intrusion into their homes. The exhibit was stricken from the record because it was not properly authenticated.[2] The Magistrate Judge, nonetheless, ferreted through the record and found that there was no evidence that would in fact demonstrate that these plaintiffs lost any pets or "suffer[ed] any type of damages as a result of the defendants' actions. (Docket No. 262 at 17). Accordingly, the Magistrate Judge recommended the dismissal of the Twelve Plaintiff Families' claims because of lack of standing. In addition, the Magistrate Judge recommends that this Court not exercise supplemental jurisdiction over the Twelve Plaintiff Families' state law claims.

Next, the Magistrate Judge recommended that Defendants' request for summary judgment on Plaintiffs' Fourth Amendment claim be denied. The Magistrate Judge noted that pursuant to the Fourth Amendment, Plaintiffs' pets were protected from unreasonable search

---

[2] It has long been settled law that "[d]ocuments supporting or opposing summary judgment must be properly authenticated." Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) (citing Fed.R.Civ.P. 56(e)). Unless an exhibit is self-authenticating pursuant to Fed.R.Evid. 902, the exhibit must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). Id. (internal citation omitted). The failure to authenticate precludes the consideration of the supporting documents at the summary judgment stage. Id.

and seizures. Furthermore, the Magistrate Judge acknowledged that the killing of a person's pet without the owner's consent is a seizure for purposes of the Fourth Amendment. The Magistrate Judge concluded that Plaintiffs' Fourth Amendment claims could not be summarily disposed of because there were genuine issues as to the following material facts: (1) that some of the Plaintiffs voluntarily delivered their animals to Defendants; (2) that Defendants engaged in a consensual conversation with Plaintiffs; (3) that Defendants intruded into areas where Plaintiffs had a reasonable expectation of privacy; and (4) that some of the animals taken were dangerous or strays in a public area of the housing projects. Additionally, the Magistrate Judge concluded that Defendants failed to demonstrate that there was no genuine issue that their conduct was not causally connected to the deprivation of Plaintiffs' federal rights. Likewise, because of the material facts in genuine dispute, the Magistrate Judge determined that the Mayor and Defendants II's request for qualified immunity should be denied. Moreover, the Magistrate Judge disagreed with Defendants I's argument that their actions were administrative in nature and, therefore, did not violate the Fourth Amendment. The Magistrate Judge also found unavailing the Municipality's contention that Plaintiffs' claims against it should be dismissed because there was no official policy of the Municipality in place that resulted in or compelled the violation of Plaintiffs' constitutional rights.

The Magistrate Judge recommended that summary judgment be entered as to Plaintiffs' procedural due process claims under the Fourteenth Amendment. In his Report and Recommendation, the Magistrate Judge stated that "Plaintiffs were deprived of their property by the mayor's unauthorized acts." (Docket No. 262 at 49). The Magistrate Judge concluded that Plaintiffs' procedural due process claims should be dismissed because the existing state laws afforded Plaintiffs with sufficient post deprivation remedies. Finally, the Magistrate Judge recommended that Plaintiffs' request for injunctive relief be denied because it was moot. (Docket No. 262).

On November 24, 2009, Plaintiffs filed their objections. First, Plaintiffs objected to the Magistrate Judge's decision to recommend the dismissal of their Fourteenth Amendment procedural due process claims against Defendants. Plaintiffs contend that their rights under the Fourteenth Amendment were violated by Defendants because they were not provided with an opportunity to be heard before their pets were taken from them. According to Plaintiffs, the Mayor acted pursuant to Ordinance No. 33 when he ordered the removal of Plaintiffs' pets without a pre-deprivation hearing. Plaintiffs further argue that the Magistrate Judge erred in finding that Defendants' failure to provide a pre-deprivation hearing did not violate the Fourteenth Amendment because the state tort laws provided adequate post deprivation remedies. Moreover,

Plaintiffs objected to the Magistrate Judge's conclusion that their request for injunctive relief is moot. Plaintiffs stress that such request is not moot because Ordinance No. 33, which prohibits the owning of pets in public housing projects, has not been derogated, and therefore, can be enforced by Defendants I at any time. Finally, Plaintiffs objected to the dismissal of the claims submitted by the Twelve Plaintiff Families. Plaintiffs argue that the Twelve Plaintiff Families have standing to bring their claims under the Fourth and Fourteenth Amendments. Moreover, Plaintiffs object to the Magistrate Judge's statement that the Twelve Plaintiff Families did not "suffer any damages as a result of defendants' actions." (Docket No. 262 at 17). According to Plaintiffs, such statement could be misconstrued to indicate that the Twelve Plaintiff Families did not suffer any damages under federal or state law. Plaintiffs argue that the Magistrate Judge erred in making that statement because whether the Twelve Plaintiff Families' suffered damages under state law was not an issue raised by Defendants in their motions. (Docket No. 263).

On December 1, 2009, Defendants I objected to the Magistrate Judge's Report and Recommendation. Defendants I argue that the Magistrate Judge erred in not considering as uncontested facts that: (1) the conversations between Defendants and Plaintiffs were consensual; (2) the vast majority of Plaintiffs declined to deliver an animal; and (3) that the public housing complexes have a large

number of strays. According to Defendants I, these facts are
essential for determining whether their acts were in violation of
the Fourth Amendment. Defendants I also contend that Plaintiffs'
Fourth Amendment claims against the Mayor in his personal capacity
should be dismissed. Defendants I stress that the Mayor limited his
actions to knocking on the doors of the residences and engaging in
consensual conversations with the Plaintiffs where he asked them to
voluntarily turn over their pets to the Municipality. Defendants I
submit that such actions are not prohibited by the Fourth Amendment
and cannot be classified as an "incursion" as stated by the
Magistrate Judge in his Report and Recommendation. (Docket No. 262
at 27). Defendants I further argue that the Fourth Amendment claims
against the Mayor in his personal capacity should be dismissed
because he is entitled to qualified immunity.

        Defendants I further aver that the claims by the four (4)
plaintiff families that delivered their pets to Defendants
(hereinafter "the Four Plaintiff Families I") cannot survive
summary judgment because their pets were not "seized" for purposes
of the Fourth Amendment. These Plaintiffs are: (1) Rafet Candelaria
("Candelaria"), (2) Jessica Fuentes, her husband Jose Rodriguez
Marin and their children: David Fuentes and Jose E. Rodriguez
Fuentes ("Fuentes Household"), (3) Ramona Ojeda Gonzalez ("Ojeda"),
and (4) Maria Rios Colon and her children: Carlos David Colon,
Leoniel Melendez, and Jesus Melendez ("Rios Household"). Likewise,

Defendants I move for the dismissal of the claims proffered by the four (4) plaintiff families whose pets were taken from public spaces in the housing developments. These plaintiffs are: (1) Jennifer Jimenez and her children: Janice Torres and Joedniel Torres ("Jimenez Household"), (2) Sonia Kortright Sanchez ("Kortright"), (3) Maribel Rivera Varela and her children: Keysha Rivera and Naysha Rivera ("Rivera household"), and (4) Antonia Morales and her children: Kelvin Morales and Randy Morales ("Morales Household")(collectively referred to as "the Four Plaintiff Families II"). According to Defendants I, the Four Plaintiff Families II's rights under the Fourth Amendment were not violated, as said Plaintiffs do not have any reasonable expectation of privacy in allowing their pets to run free in a public space. Defendants I aver that because the public housing developments were overrun with strays, the Four Plaintiff Families II's pets were reasonably deemed to be strays. Furthermore, Defendants I stress that one of the pets taken from the public area was of a dangerous breed. Defendants I also submit that the Fourth Amendment claims brought by the seven (7) plaintiff families whose pets were taken from their balcony area should be dismissed because the nature of the balcony areas, which consisted of concrete slabs, do not give rise to a right protected by the Fourth Amendment. These plaintiffs are: (1) Madeline Maldonado and her husband Abraham Valencia and their children: Alex Maldonado Valencia, Edgar Maldonado Valencia,

and Christian Maldonado Valencia ("Maldonado Household"), (2) Angel Rafael Sierra and his wife Evelyn Vazquez and their children: Angelica, Karina, Sorimar, Christopher, Neysha, and Miguel Angel Sierra Vazquez ("Sierra Household"), (3) Angelica Valle and her children: Elbi Molina, Kelvin Molina, and Idaly Molina ("Valle Household"), (4) Carmen Valle ("Carmen Valle"), (5) Carmen Vazquez and her children: Derek Cruz and Alex Joel Vazquez ("Vazquez Household"), (6) Ruth Vidot and her children Jahaira Santana: Luisa Maria Santana, Grace Santana, Virgen Rivera, and Maria Dahlia Rivera ("Vidot Household"), and (7) Judith Varela and her children: Johamed Rivera, Julian Lopez Rivera, and Ashley Rivera ("Varela Household") (collectively referred to as "the Seven Plaintiff Families"). Finally, Defendants I contend that the Municipality cannot be held liable because an official policy of the Municipality was not responsible for the alleged deprivation of constitutional rights suffered by Plaintiffs. (Docket No. 272).

Defendants II also objected to the Magistrate Judge's Report and Recommendation, and move for the dismissal of Plaintiffs' personal and official capacity claims against them. Defendants II contend that Defendant Esther Ruiz ("Ruiz") never entered any of Plaintiffs' residences and, as such, she cannot be held liable under the Fourth Amendment. Moreover, Defendants II argue that Plaintiffs' Fourth Amendment claims against Defendant Leonides Gonzalez ("Gonzalez") should be dismissed because she did not enter

Civil Case No. 07-1992 (JAG)                                    19

any home, threaten any resident or remove any pet. For the just
mentioned reasons, Defendants II aver that Plaintiffs' Fourth
Amendment claims against Defendant Sylvia Riquelme ("Riquelme")
should be dismissed. Defendants II also object to the Magistrate
Judge's decision not to recommend the dismissal of the claims
proffered against Defendant Ahmid Molina ("Molina") under the
Fourth Amendment. According to Defendants II, Molina did not enter
into any of Plaintiffs' homes and limited his actions to knocking
Plaintiffs' doors and talking to them outside of their residences.
In addition, Defendants II claim that Edgardo Santiago's
("Santiago") actions did not violate Plaintiff's rights under the
Fourth Amendment. Defendants II concede that Santiago entered
Plaintiff Jessica Fuentes' home. Defendants II, however, argue that
Plaintiff Jessica Fuentes consented to Santiago's entry for the
purpose of picking up her dog. According to Defendants II,
Santiago's consensual entry into Plaintiff Jessica Fuentes' home
was not in violation of her rights under the Fourth Amendment.
(Docket No. 275). Both Plaintiffs and Defendants filed reply
briefs. (Docket Nos. 277, 280, 283, 286, and 289).

**STANDARD OF REVIEW**

1. Standard for Reviewing a Magistrate-Judge's Report and
Recommendation

Pursuant to 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); and
Local Rule 503; a District Court may refer dispositive motions to

Civil Case No. 07-1992 (JAG)                                           20

a United States Magistrate Judge for a Report and Recommendation. See <u>Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.</u>, 286 F.Supp.2d 144, 146 (D.P.R. 2003). The adversely affected party may "contest the Magistrate Judge's report and recommendation by filing objections 'within ten days of being served' with a copy of the order." <u>United States of America v. Mercado Pagan</u>, 286 F.Supp.2d 231, 233 (D.P.R. 2003) (citing 28 U.S.C. § 636(b)(1)). If objections are timely filed, the District Judge shall "make a <u>de novo</u> determination of those portions of the report or specified findings or recommendation to which [an] objection is made." <u>Rivera-De-Leon v. Maxon Eng'g Servs.</u>, 283 F. Supp. 2d 550, 555 (D.P.R. 2003). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," however, if the affected party fails to timely file objections, "the district court can assume that they have agreed to the magistrate's recommendation." <u>Alamo Rodriguez</u>, 286 F.Supp.2d at 146 (citing <u>Templeman v. Chris Craft Corp.</u>, 770 F.2d 245, 247 (1st Cir. 1985)).

    2. <u>Summary Judgment Standard</u>

     "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." <u>Thompson v. Coca-Cola Co.</u>, 522 F.3d 168, 175 (1st Cir.

2008) (citing Fed.R.Civ.P. 56(c)). The issue is "genuine" if it can be resolved in favor of either party. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" if it has the potential to change the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "In prospecting for genuine issues of material fact, we resolve all conflicts and draw all reasonable inferences in the nonmovant's favor." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008).

Although this perspective is favorable to the nonmovant, once a properly supported motion has been presented before this Court, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant this Court's denial of the motion for summary judgment. Anderson, 477 U.S. at 248. The opposing party must demonstrate "through submissions of evidentiary quality, that a trialworthy issue persists." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (internal citations omitted). Moreover, on issues "where [the opposing] party bears the burden of proof, it 'must present definite, competent evidence' from which a reasonable jury could find in its favor." United States v. Union Bank for Sav. & Inv.(Jordan), 487 F.3d 8, 17 (1st Cir. 2007) (citing United States v. One Parcel of Real Property,

Civil Case No. 07-1992 (JAG)                                          22

960 F.2d 200, 204 (1st Cir. 1992)). Hence, summary judgment may be
appropriate, if the non-moving party's case rests merely upon
"conclusory allegations, improbable inferences, and unsupported
speculation." Forestier Fradera v. Municipality of Mayaguez, 440
F.3d 17, 21 (1st Cir. 2006) (citing Benoit v. Technical Mfg. Corp.,
331 F.3d 166, 173 (1st Cir. 2003)). It is important to note that
throughout this process, this Court cannot make credibility
determinations, weigh the evidence, and make legitimate inferences
from the facts, as they are jury functions, not those of a judge.
Anderson, 477 U.S. at 255.

## DISCUSSION

Pursuant to the objections submitted by the parties, this
Court must determine whether Plaintiffs' claims against Defendants
under the Fourteenth Amendment should be summarily disposed of.
Moreover, we must address whether Defendants are entitled to
summary judgment on Plaintiffs' Fourth Amendment claims. Finally,
we must determine whether Plaintiffs' request for injunctive relief
is moot.

1. Fourteenth Amendment

Plaintiffs contend that their rights under the Fourteenth
Amendment were violated by Defendants because they were not
provided with an opportunity to be heard before their pets were
taken from them. The Due Process Clause of the Fourteenth Amendment
provides that property cannot be deprived except pursuant to

constitutionally adequate procedures. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985). "[T]o establish a 'procedural due process claim under [§] 1983, a plaintiff must allege first that [he] has a property interest as defined by state law and, second, that the defendants, acting under color of state law, deprived [him] of that property interest without [a] constitutionally adequate process.'" Diaz-Pedrosa v. P.R. Power Auth., 555 F. Supp. 2d 306, 315 (D.P.R. 2008) (internal citations omitted) (alterations in original). The Fourteenth Amendment requires that the deprivation of a property interest "be preceded by notice and opportunity for hearing appropriate to the nature of the case." Id. at 542 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)). The determination of whether someone is entitled to a pre-deprivation hearing is fact-specific, as "due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976). To determine whether a pre-deprivation hearing was required in this case this Court must consider three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value of additional or substitute procedural safeguards; and (3) the Government's interest. Id. at 335. After considering all three factors, this Court finds that Plaintiffs were entitled

Civil Case No. 07-1992 (JAG)                                          24

to a pre-deprivation hearing.

First, as discussed in our previous opinion, for purposes of the Fourteenth Amendment, people have a protected property interest over their pets. (Docket No. 91). Second, the manner in which Plaintiffs' pets were removed did not provide any adequate safeguards or protection against an arbitrary and capricious determination. Hence, the risk of an erroneous deprivation was high. Finally, the Defendants' interests would not have been harmed by providing Plaintiffs with a hearing prior to the deprivation of their pets. Consequently, we find that a pre-deprivation hearing was required prior to removing and destroying any pets from the housing complexes.

We note that the failure to provide a pre-deprivation hearing does not necessarily offend the Fourteenth Amendment if the deprivation was caused by the "random and unauthorized" act of a state employee. Hudson v. Palmer, 468 U.S. 517, 533 (1984), Parratt v. Taylor, 451 U.S. 527, 541 (1981). "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). This is what is known as the Hudson-Parratt doctrine which the First Circuit has repeatedly held applies only where the deprivation complained of is "'random and unauthorized.'" O'Neill

Civil Case No. 07-1992 (JAG)                                         25

v. Baker, 210 F.3d 41, 50 (1st Cir. 2000). As the Hudson Court
reasoned, meaningful post-deprivation state remedies satisfy due
process in such circumstances because it is "simply impracticable"
for the state to provide pre-deprivation process where it cannot
anticipate when the "random and unauthorized" deprivation will
occur. Hudson v. Palmer, 468 U.S. at 533. By contrast, a state may
be able to predict the occurrence of deprivations caused by
operation of its own pre-existing procedures. See Parratt, 451 U.S.
at 541. The availability of post-deprivation remedies does not
defeat a § 1983 claim where the alleged loss results from adherence
to an established state or municipal policy. See O'Neill, 210 F.3d
at 50; Pangburn v. Culbertson, 200 F.3d 65, 71 (2d Cir. 1999).
Courts must therefore scrutinize carefully the assertion by state
officials that their conduct is "random and unauthorized." Id.

In the case at bar, Defendants I do not assert that their
conduct was random and unauthorized. Defendants I submit that the
removal of Plaintiffs' pets from the housing complexes was done
pursuant to the Pet Policy in place. (Docket No. 230 at 8).
Plaintiffs, on the other hand, argue that the Pet Policy which
Defendants I contend that they acted pursuant to was not in effect.
(Docket No. 214-2 at 7 and 8). Plaintiffs submit that the policy in
place when their pets were removed allowed pets. Id. According to
Plaintiffs, Defendants I acted pursuant to Ordinance No. 33, which
as mentioned above, was enacted by the Municipality to prohibit

Civil Case No. 07-1992 (JAG)                                        26

pets in the housing complexes. (Docket Nos. 214-2 at 47 ¶ 44; 224-4, Exh. 2 at 7-9; & 244-2, Exh. 4). In support of this fact, Plaintiffs submitted the Mayor's answer to Plaintiffs' interrogatory in which he stated that his actions "were taken pursuant to Ord[i]nance 33, to the duties imposed by the Autonomous Municipal Act, the Contract between the Municipality and the Puerto Rico Public Housing Authority, the lease contract between the residents and the PRPHA, and the Pet Policy promulgated by said agency. (Docket No. 214-78, Exh. 70 at 4). Thus it is contested whether Defendants I acted under Ordinance No. 33, as argued by Plaintiffs, or pursuant to the Pet Policy in place as alleged by Defendants I. It is clear, however, that Defendants are not arguing that the removal of Plaintiffs pets was a random and unauthorized act. Consequently, the Hudson-Parrat doctrine cannot apply here.

The record also reflects that Defendants I's notice was not afforded at a meaningful time and in a meaningful manner. Procedural due process requires that the right to notice and an opportunity to be heard "be granted at a meaningful time and in a meaningful manner." Fuentes v. Shevin, 407 U.S. 67, 80 (1972) (citing Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). From October 5, 2007 until October 7, 2007, the administrators notified the residents of the housing developments that they were not allowed to have pets. The letter, however, did not indicate whether or when personnel would enter the housing developments to enforce the

purported ban on pets. On October 8, 2007, the Mayor, along with
employees from both the Municipality and ACS, went into each of the
public housing communities in order to execute an operation for the
pick up of the pets in possession of public housing residents. This
is clearly not enough to meet the "meaningful time" requirement.

In sum, pursuant to the Fourteenth Amendment, a pre-
deprivation hearing was required before depriving Plaintiffs of
their pets. Defendant I would thus be entitled to summary judgment
only on the claims proffered by Plaintiffs who did not lose a pet,
as they were not deprived of their property. Defendants I have the
burden of demonstrating that it is uncontested that each Plaintiff
did not lose a pet.

It is uncontested that the Twelve Plaintiff Families did not
lose their pets. (Docket  No. 182, Exh. 10, at 9-10; Exh. 11, at
10; Exh. 12, at 14; Exh. 13, at 9-10; Exh. 14, at 10; Exh. 15, at
12; Exh. 16, at 16-17; Exh. 17, at 11-12; Exh. 18, at 12; Exh. 19,
at 18-19; Exh. 20, at 12-13; Exh. 21, at 12-13). Consequently, the
Fourteenth Amendment claims proffered by the Twelve Plaintiff
Families must be summarily disposed of. All of the other Plaintiffs
were deprived of their pets.[3] Hence, the Fourteenth Amendment

---

[3] We note that Defendants I claim that the Four Plaintiff
Families I "voluntarily" surrendered their pets. For purposes of
claims under the Fourteenth Amendment claims, the state
deprivation of a constitutional protected interest in property is
not itself unconstitutional; what is unconstitutional is the
deprivation of such interest without the due process of law.
Zinermon v. Burch, 494 U.S. 113, 126 (1990). Thus the fact that

procedural due process claims proffered by the remaining Plaintiffs will not be dismissed. We now proceed to lay down the legal framework necessary to address whether Plaintiffs' Fourth Amendment claims should be summarily disposed of.

    2. <u>Fourth Amendment</u>

    The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Plaintiffs argue that their rights under the Fourth Amendment were violated because their pets were subject to an unreasonable seizure. Furthermore, they argue that some of their homes were subject to an unreasonable search and seizure by Defendants.

    For purposes of the Fourth Amendment, pets are "effects" and, therefore, protected from unreasonable seizures. <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 271 (1st Cir. 2009). "The killing of a person's pet dog or cat by the government without the person's consent is [] a seizure within the meaning of the Fourth Amendment." <u>Id.</u> To be constitutionally valid, however, the "seizure" i.e., the killing of a person's pet must be "reasonable." <u>Brown v. Muhlenberg Twp.</u>, 269 F.3d 205, 210 (3d Cir. 2001). "The Supreme Court has viewed a seizure of personal property as per se

---

the Four Plaintiff Families delivered their pets does not entail that they waived any claims under the Fourteenth Amendment for the deprivation of their property without the due process of law.

unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." United States v. Place, 462 U.S. 696, 701 (1983). A warrantless seizure may be reasonable when there is a sufficiently compelling governmental interest justifying the seizure and the extent of the intrusion occasioned by the seizure is not disproportionate to that interest. Brown, 269 F.3d at 210. "Thus, when the state claims a right to make a warrantless seizure, we 'must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" Id. (citing Place, 462 U.S. at 703). The seizure will be found unreasonable if it is disproportionately intrusive, and the state's interest is sufficiently compelling to justify only a warrantless seizure that is minimally intrusive. Id.

The killing of a person's pet constitutes an unconstitutional destruction of property absent a sufficiently compelling public interest. San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962, 977 (9th Cir. 2005). Defendants justify the warrantless seizure of Plaintiffs' pets by arguing that the pets were reasonably deemed to be stray or dangerous. The killing of a person's pet does not constitute a Fourth Amendment seizure if it poses an imminent danger such that the state's

interest in protecting life and property is implicated. Brown, 269 F.3d at 210. In such a case, "the state's interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence." Id. at 210-11. The Fourth Amendment, however, does not allow the state to destroy a pet when it poses no immediate danger and the pet is taken from an owner who is desirous of retaining custody. See id. at 211.

The state does not violate the Fourth Amendment when it takes pets found at large into custody because the state has an interest in restraining it so that it will pose no danger to the person or property of others. Id. at 210. "The dog catcher thus does not violate the Fourth Amendment when he or she takes a stray into custody." Id. The state, however, violates the Fourth Amendment if it kills a pet that poses no danger, has wandered outside of its home, and has a known owner desirous of retaining custody. Id.

Defendants also argue that they did not transgress the Fourth Amendment because some of the Plaintiffs voluntary relinquished their pets. On the other hand, Plaintiffs submit that they were coerced into relinquishing their pets under the threat of being evicted. If a person relinquishes his property to an official due to coercion by the official, that person does not forfeit his Fourth Amendment right over the property. See Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994) (finding that a government employee did not waive his Fourth Amendment property rights over his dog

when he relinquished the dog pursuant to a direct order from his superior). This Court, nonetheless, recognizes that a warrantless seizure of property does not contravene the Fourth Amendment if the owner consents to the seizure. United States v. Perez-Montanez, 202 F.3d 434, 438-39 (1st Cir. 2000). Such consent, however, must be freely given and not the product of coercive or intimidating behavior on the part of state officials. Id.

Plaintiffs also contend that Defendants violated the Fourth Amendment because some of Plaintiffs' homes were subject to an unreasonable search and seizure. Warrantless search and seizures in the home violate the Fourth Amendment, absent consent or exigent circumstances."[4] United States v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003) (internal citation and quotation marks omitted). For a warrantless search of a home to be valid, consent must be voluntary. Id. Whether consent is voluntary is to be determined by examining the totality of the circumstances, including the interaction between the state official and the person alleged to have given consent. Id. We note that "[w]arrantless entries are most often justified by 'exigent circumstances,' the best examples being hot pursuit of a felon, imminent destruction or removal of evidence, the threatened escape by a suspect, or imminent threat to

_____

[4] Generally, this warrant requirement applies to both civil and criminal search and seizures by the police or some other government official. Bilida v. McCleod, 211 F.3d 166, 171 (1st Cir. 2000).

the life or safety of the public, police officers, or a person in residence. Bilida, 211 F.3d at 172.

Places adjacent to the home, known as "curtilage," have generally been subject to the warrant requirement. Id. at 171. To determine whether a particular area falls within the home's curtilage, this Court looks to whether it is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." United States v. Brown, 510 F.3d 57, 65 (1st Cir. 2007) (internal citations omitted).[5] A warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that a legitimate law enforcement objective exists and the intrusion upon one's privacy is limited. United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006). For instance, the Fourth Amendment is not violated when state officials enter the curtilage of a home for the legitimate purpose of knocking on the door of a person's home to seek a voluntary conversation. Id.; see also United States v. Parker, 549 F.3d 5, 8 (1st Cir. 2008); United States v. Cephas, 254 F.3d 488, 494 (4th Cir. 2001). The Mayor argues that he merely knocked on the doors of Plaintiffs' residences, and engaged in a consensual conversation

---

[5] Such analysis is guided by four specific criteria: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. Id. (internal citation omitted).

Civil Case No. 07-1992 (JAG)                                    33

with the Plaintiffs. This is what is known as a "knock and talk."

Weston, 443 F.3d at 667. As long as the "knock and talk" is a

consensual encounter, the Fourth Amendment is not contravened.

United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir.

2006).[6]

Plaintiffs bring the present suit under § 1983. It is well

settled law that § 1983 "is not itself a source of substantive

rights, but merely provides a method for vindicating federal rights

elsewhere conferred." Graham v. Connor, 490 U.S. 386, 394 (1989)

(internal citations and quotation marks omitted). Under § 1983, a

---

[6] Nevertheless, the Fourth Amendment could be implicated if
the "knock and talk" becomes coercive such as when the officers
make the people inside feel they have to open up by either
asserting their authority, refusing to leave, or otherwise making
the people inside feel they cannot refuse to open up. United
States v. Spotted Elk, 548 F.3d 641, 655 (10th Cir. 2006). We
note  that if a an officer enters the curtilage of a person's
home without a warrant and engages in a coercive "knock and
talk," such officer could engage in a unconstitutional intrusion
into the person's zone of privacy prohibited by the Fourth
Amendment. Furthermore, we interestingly note that a non-
consensual "knock and talk" encounter could also be analyzed as
an investigatory stop or seizure of the person. See Fla. v.
Bostick, 501 U.S. 429, 434 (1991) (holding that a consensual
encounter with an officer does not trigger the Fourth Amendment
as long as a reasonable person would feel free to disregard the
officer and go about his business); United States v. Fernandes,
285 Fed. Appx. 119, 123 (5th Cir. 2008) (analyzing whether an
investigatory stop-seizure was a consensual encounter and,
therefore, not in violation of the Fourth Amendment); United
States v. Ray, 199 F. Supp. 2d 1104, 1111 (D.Kan. 2002) (finding
that a knock and talk is ordinarily consensual unless coercive
circumstances such as unreasonable persistence by the officers
turns the encounter into an investigatory stop); United States v.
Ponce Munoz, 150 F. Supp. 2d 1125, 1133 (D.Kan. 2001) (same).

plaintiff must first show that "the conduct complained of was committed by a person acting under color of state law." Destek Group, Inc. v. State of New Hampshire Public Utilities Commission, 318 F.3d 32, 39 (1st Cir. 2003); DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 33 (1st Cir. 2001). Secondly, a plaintiff must show the defendant's conduct deprived a person of rights, privileges, or immunities secured by the Constitution of the United States. Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 559 (1st Cir. 1989). "To satisfy the second element, plaintiffs must show that the defendants' conduct was the cause in fact of the alleged deprivation." Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997). Defendants argue that the second prong is not satisfied here because their conduct did not violate Plaintiffs' rights under the Fourth Amendment. Accordingly, this Court must individually address whether Defendants are each entitled to summary judgment because their conduct did not affect Plaintiffs' constitutional rights under the Fourth Amendment.

First, the Twelve Plaintiff Families' claims under the Fourth Amendment must be examined. Since the Twelve Plaintiff Families did not lose a pet they did not suffer a Fourth Amendment seizure. Furthermore, they were not subject to a warrantless search of their homes. (See Docket No. 182, Exh. 10, at 9-10; Exh. 11, at 10; Exh. 12, at 14; Exh. 13, at 9-10; Exh. 14, at 10; Exh. 15, at 12; Exh. 16, at 16-17; Exh. 17, at 11-12; Exh. 18, at 12; Exh. 19, at 18;

Civil Case No. 07-1992 (JAG)                                      35

Exh. 20, at 12-13; Exh. 21, at 12-13).[7] Accordingly, the Twelve
Plaintiff Families' claims under the Fourth Amendment must be
dismissed.[8]

   A. <u>The Mayor</u>

   Defendants I move to dismiss Plaintiffs' personal capacity
claims against the Mayor under the Fourth Amendment. In their
objections, Defendants I aver that the Mayor's actions did not go
against the Fourth Amendment. Defendants I submit that the Mayor's
actions were limited to knocking on the doors of Plaintiffs'
residences and asking whether they voluntarily wished to deliver
their pet to the Municipality. In support of this fact, Defendants
I submitted the deposition of one of the Plaintiffs, Mariyunaira
Rivera, who stated that her interaction with the Mayor was limited
to a short conversation after the Mayor knocked on her door.
Namely, the Mayor together with other individuals asked Mariyunaira
Rivera if she had any pets, which she negated, even though she had
pet cats. Immediately thereafter, the Mayor and the other
individuals left. Mariyunaira Rivera's cats were never taken by
Defendants. (Docket No. 182, Exh. 16 at 16-17). We find that the

_____

        [7]<u>See also</u> Docket No. 214-2, at 51-52, 57-58, 64-67, 72-82,
84-85.

        [8]Since all federal claims against the Twelve Plaintiff
Families will be dismissed, this Court need not address
Defendants I's argument that the Twelve Plaintiff Families lack
standing to bring their claims.

Civil Case No. 07-1992 (JAG)                                    36

Mayor's interaction with Plaintiff Mariyunaira Rivera was a "knock and talk" that does not violate the Fourth Amendment. Mariyunaira Rivera and her child Victor Manuel is one of the Twelve Plaintiff Families whose federal claims have already been dismissed.

Moreover, to support the Mayor's "knock and talk" argument, Defendants I point to the deposition testimony of Plaintiff Jessica Fuentes and Antonia Morales. The Mayor states that both of the Plaintiffs claim that a Defendant entered their home. Jessica Fuentes makes no mention of the Mayor when describing how her home was entered. (Docket No. 182, Exh. 23 at 29). The Mayor essentially requests that because Jessica Fuentes made no mention of him, we must infer that his actions as to her were limited to a "knock and talk." At summary judgment, however, inferences are made in the non-movant's favor. Vineberg, 548 F.3d at 56. Likewise, the Mayor implies the same averment by submitting the deposition testimony of Antonia Morales which makes no mention of him. (Docket No. 182, Exh. 28). The Mayor does not point to other evidence that supports that he only knocked on the doors of the other Plaintiffs and engaged in consensual conversations with them. Moreover, this Court is not required to "ferret through the record" in search of facts that may favor the parties. Morales v. Orssleff's Eftf, 246 F.3d 32, 33 (1st Cir. 2001). The Mayor seems to argue that we must infer that he acted with each Plaintiff in the same manner that he did with Mariyunaira Rivera, which this Court cannot do. Plaintiffs on

the other hand submitted evidence that the Mayor seized pets. (Docket No. 214 at 29 & Docket No. 214-2 at 46-47, ¶¶ 40-41).

After drawing all inferences in Plaintiffs' favor, we find that a trial-worthy issue exists whether the acts of the Mayor as to the other Plaintiffs were limited to "knock and talks." Based on the uncontested fact that some of the pets were thrown from a bridge to their death, we further hold that there is a trial worthy issue whether the pets taken were subject to an unreasonable seizure in violation of the Fourth Amendment. Since Defendants I have failed to show that it is uncontested that the Mayor limited his actions to a "knock and ask,"with respect to the other Plaintiffs, the Mayor is not entitled to summary judgment on such grounds.[9] The Mayor could have only avoided this conclusion by pointing this Court to evidence that his specific encounter with each of the Plaintiffs was limited to a "knock and talk." The Mayor fulfilled this burden only as to Mariyunaira Rivera and her child Victor Manuel.

Defendants I also grounded their objection to the Magistrate Judge's decision to deny the Mayor qualified immunity on their allegation that the Mayor only engaged in "knock and talks."

---

[9] Defendants I further argued that Plaintiffs' Fourth Amendment rights were not violated because the Mayor's conversations with Plaintiffs were consensual. This Court need not discuss this argument because Defendants I have failed to show for purposes of summary judgment that the Mayor's actions were limited to knock and talks.

Civil Case No. 07-1992 (JAG)                                    38

Qualified immunity is a judge-made doctrine that allows public
officials to perform discretionary tasks in the public sector
without the constant threat of legal liability in their personal
capacity. Pagan v. Calderon, 448 F.3d 16, 31 (1st Cir. 2006);
Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir.
1993).[10] When qualified immunity has been raised at the summary
judgment stage, the Court must look at the record, particularly

_____

    [10] "The Supreme Court's most recent rulings on qualified
immunity provide clarification on several points and require some
revision of the nomenclature and steps this circuit has
previously used." Maldonado, 568 F.3d at 268. "In Pearson v.
Callahan, 129 S. Ct. 808 (2009), the Court reiterated that the
qualified immunity inquiry is a two-part test." Id. at 268-269.
"A court must decide: (1) whether the facts alleged or shown by
the plaintiff make out a violation of a constitutional right; and
(2) if so, whether the right was "clearly established" at the
time of the defendant's alleged violation." Id. at 269 (citing
Pearson, 129 S. Ct. at 815-16).
    "It is clear from the Supreme Court's description of the
second, 'clearly established' step of the qualified immunity
analysis that the second step, in turn, has two aspects. Id. One
aspect focuses on "the clarity of the law at the time of the
alleged civil rights violation." Id. "[Q]ualified immunity
operates to ensure that before they are subjected to suit,
officers are on notice their conduct is unlawful." Pearson, 129
S. Ct. at 822. If judges disagree on a constitutional question or
there is a "divergence of views", such as in the case of a
Circuit split, "it is unfair to subject police to money damages
for picking the losing side of the controversy." Id. at 823.
    The other aspect focuses on "the facts of the particular
case and whether a reasonable defendant would have understood
that his conduct violated the plaintiffs' constitutional rights."
Maldonado, 568 F.3d at 269. "Qualified immunity balances two
important interests- the need to hold public officials
accountable when they exercise power irresponsibly and the need
to shield officials from harassment, distraction, and liability
when they perform their duties reasonably." Pearson, 129 S. Ct.
at 815.

Civil Case No. 07-1992 (JAG)                                    39

with respect to a defendant's acts, and determine whether a genuine issue does or does not exist concerning qualified immunity. Aldarondo-Lugo v. Santiago-Diaz, 329 F. Supp. 2d 234, 237 (D.P.R. 2004) (internal citation omitted). Here, there is a genuine issue of a material fact that precludes the Mayor's request for qualified immunity. Specifically, Defendants I have failed to show that there is no genuine issue as to the fact that the Mayor only engaged in "knock and talks" with the remaining Plaintiffs.

   B. The Municipality

   The Municipality argues that it cannot be found liable under the Fourth Amendment because the violations alleged by Plaintiffs were not the result of its official policy. The Municipality is correct in that it can only be held liable under § 1983 for constitutional violations only if they occur pursuant to an official policy or custom. Welch v. Ciampa, 542 F.3d 927, 942 (1st Cir. 2008) (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978)). Here, whether the Municipality acted pursuant to an official policy or custom is in dispute. As discussed above, there is a genuine issue whether the Municipality acted pursuant to Ordinance No. 33. Consequently, this Court cannot grant the Municipality's request for summary judgment on the grounds that the alleged violations did not occur pursuant to its official policy.

   Defendants I further argue that the Municipality's actions should be deemed reasonable, and not in violation of the Fourth

Amendment because there were a large amount of strays in the
housing complexes. Basically, the Municipality avers that those
Plaintiffs whose pets were seized outside of their homes, in the
public spaces of the housing complexes, did not suffer a Fourth
Amendment violation because their pets were reasonably deemed to be
strays. The Municipality cannot be found liable under the Fourth
Amendment when it takes animals found at large into custody because
it has an interest in restraining them so that they will pose no
danger to the person or property of others. The Municipality,
however, does go against the Fourth Amendment when it takes and
destroys a pet that poses no danger and has wandered outside of its
home, if it has a known owner.

It is uncontested that there was a large number of strays in
the housing complexes. (Docket No. 182, Exh. 4 & Exh. 22 at 16-17).
Defendants I, nonetheless, fail to submit evidence that the Four
Plaintiff Families II, who are the only Plaintiffs that according
to Defendants had their pets at large in the housing complexes, had
pets that were reasonably deemed to be strays. Kortright's pet dog
ran outside as the animals were being collected. (Docket No. 214-
56, Exh. 48 at 14). Kortright's dog was taken despite her request
to give the dog back. Id.

Kortright's dog was an American Stafford Terrier. (Docket No.
182, Exh. 27 at 22). According to Defendants I, the taking of
Kortright's dog was reasonable because an American Stafford Terrier

Civil Case No. 07-1992 (JAG)                                      41

is a Pit Bull, which is a dangerous breed with an exceptional
strong jaw. Defendants, however, fail to show that the dog posed
any immediate danger. The Fourth Amendment does not allow the
Municipality to destroy a pet when it poses no immediate danger and
the dog is taken from an owner who is desirous of retaining
custody. We note that in Brown, the court held that a police
officer committed an unreasonable seizure within the meaning of the
Fourth Amendment when it killed a pet Rottweiler, a large dog with
a strong jaw, that posed no immediate danger, and had wandered to
a public area, and whose owners were known, available, and desirous
of assuming custody. Brown, 269 F.3d 209-12. Likewise, we find that
Defendants I are not entitled to summarily dispose of Kortright's
claims because they have not shown that her dog posed an immediate
danger.

     The Jimenez Household's pet was also taken in the presence of
its owners as it just had left its home. The Jimenez Household's
pet had wandered outside its home and was picked up in front of the
house of Jeniffer Jimenez' mother, who lives two houses down from
the Jimenez Household's residence. (Docket No. 214-52, Exh. 43 at
9-10). The Jimenez Household was even told that the dog would be
taken to the shelter. Id. The Jimenez Household's pet could not
reasonably deemed to be a stray as it had a known owner. The fact
that the Jimenez Household's pet was outside of its home when it
was picked up does not entitle Defendants to summary judgment

Civil Case No. 07-1992 (JAG)                                    42

because, as discussed above, the Fourth Amendment does not allow
the Municipality to take and destroy a pet that has wandered
outside of its home when it poses no immediate danger, and the dog
is taken from an owner who is known and desirous of retaining
custody. Likewise, the Rivera Household and the Morales Household's
pet were taken from their known owners. The Morales Household's pet
was taken while it was next to Antonia Morales's son. (Docket No.
214-42, Exh. 31 at 15). The dog whose name is "Peludo" was grabbed
and hit. Id. The hit made Peludo bleed and drop to the ground. Id.
Thereafter, the dog was taken. Id. The Rivera Household's pet was
taken in front of Maribel Rivera's boyfriend, who requested that
the dog be returned. (Docket No. 214-54, Exh. 46 at 11).

       In sum, this Court finds without merit Defendants I's claim
that the Municipality cannot be held liable because the animals
taken could reasonably deemed to be strays that posed a danger to
life and property. As such, the Four Plaintiff Families II's claims
will not be dismissed.

       C. The Four Plaintiff Families I

       Defendants argue that the Four Plaintiff Families I did not
suffer a Fourth Amendment violation because they voluntarily
delivered their pets. We disagree. The Four Plaintiff Families I
delivered their pets after they were threatened with having their
lease contract cancelled and being evicted from their houses.
(Docket Nos. 182, Exh. 22 at 9; 214-79, Exh. 71 at 12; 214-61, Exh.

Civil Case No. 07-1992 (JAG)                                      43

53 at 10 & 214-40, Exh. 29 at 14-15). After having all reasonable

inferences made in the Four Plaintiff Families I's favor, this

Court finds for purposes of summary judgment that the Four

Plaintiff I were coerced into giving their dogs to Defendants. As

such, this Court cannot summarily dispose of the Four Plaintiff

Families I's claims on the basis that they consented to the seizure

of their pets.

     D. <u>The Seven Plaintiff Families</u>

     Defendants also move to dismiss the Seven Plaintiff Families'

Fourth Amendment claims. Defendants allege that the Seven Plaintiff

Families' pets were taken from the balconies of their residences.

Defendants aver that the balconies of the Seven Plaintiff Families'

apartment were mere cement slabs that could not be considered part

of the curtilage of their homes. According to Defendants, the Seven

Plaintiff Families had no privacy interest over their balconies

and, as such, cannot claim to have suffered a Fourth Amendment

violation because their pets were taken from that area.

     This Court need not decide whether the balconies of the Seven

Plaintiff Families were part of the curtilage of their homes. It is

uncontested that the Seven Plaintiff Families' pets were seized, as

they were taken and destroyed. Defendants have not submitted any

evidence that the Seven Plaintiffs consented to the seizure; that

their pets were strays; or that their pets posed an immediate

danger to life and property. Hence, the seizure of their pets is

Civil Case No. 07-1992 (JAG)                                          44

deemed unreasonable for purposes of this motion. As a result, the
Seven Plaintiff Families' claims cannot be dismissed. This Court
must now address Defendants II's objection to the Magistrate
Judge's recommendation to deny their motion for summary judgment.
Defendants II argue that the claims proffered against them in their
official and personal capacity should be dismissed.

    E. <u>Ruiz</u>

    Ruiz is the Director of Federal Programs at the Municipality.
(Docket No. 194 at 1). Ruiz drafted the letter sent to all
residents warning them that they would be evicted should they
oppose the removal of pets. (Docket No. 194 at 2). Ruiz was warned
that the Pet Policy in place allowed residents to have pets.
(Docket No. 224-5, Exh. 3 at 14). Furthermore, Ruiz was warned that
the pet policy, which did not allow pets, was a draft that expired
in 2002. (Docket No. 224-4, Exh. 2 at 8). Ruiz, nonetheless,
believed that pursuant to Ordinance No. 33, the residents in the
housing projects could not have pets and, therefore, could be
required to hand over their pets or face eviction. (Docket No. 224-
4, Exh. 2 at 7-9). Ruiz was present at one of the housing complexes
while Plaintiffs' pets were being removed. (Docket No. 224-3, Exh.
1 at 39-40).

    Defendants II argue that Ruiz cannot be held liable under the
Fourth Amendment because Ruiz never entered any of Plaintiffs'
residences. Plaintiffs, on the other, hand argue that Ruiz, as

Director of Federal Programs at the Municipality, was involved in the decision making process to go into the housing complexes to remove Plaintiffs' pets. Plaintiffs stress that despite being warned that the pet policy in place allowed pets, Ruiz proceed to plan and take part in the taking of their pets pursuant to Ordinance No. 33.

Like municipal liability, supervisory liability cannot be predicated on a <u>respondeat</u> <u>superior</u> theory. <u>Barreto-Rivera v. Medina-Vargas</u>, 168 F.3d 42, 48 (1st Cir. 1999). Supervisors may only be held liable under § 1983 on the basis of their own acts or omissions. <u>Id.</u> Supervisory liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct that amounts to condonation or tacit authorization. <u>See</u> <u>Camilo-Robles v. Zapata</u>, 175 F.3d 41, 44 (1st Cir. 1999).

For purposes of liability pursuant to § 1983, a supervisor is defined loosely to encompass a wide range of officials who are themselves removed from the perpetration of the rights-violating behavior. <u>Camilo-Robles v. Hoyos</u>, 151 F.3d 1, 6-7 (1st Cir. 1998). Basically, a supervisor can be held liable under § 1983 if she formulates a policy or engages in a practice that leads to a civil rights violation committed by another. <u>Id.</u> at 7. Absent direct participation, a supervisor may be held liable under § 1983 in either his official or personal capacity for the behavior of his

subordinates if both: (1) the behavior of her subordinates results in a constitutional violation and (2) the supervisor's action or inaction was affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference. Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005) (internal citation and quotation marks omitted); Rodriguez-Oquendo v. Toledo-Davila, 39 F. Supp. 2d 127, 134 (D.P.R. 1999). A "plaintiff in a personal-capacity suit need not establish a connection to governmental policy or custom." Hafer v. Melo, 502 U.S. 21, 25 (1991).[11]

This Court holds that Plaintiffs have submitted sufficient evidence to create a trial worthy issue whether Ruiz as a supervisor formulated the policy that led to Plaintiffs' pets being seized and killed. Plaintiffs submitted evidence in support of the

---

[11] Generally, official-capacity suits represent another way of pleading an action against an entity of which an officer is an agent. Id. (internal citation and quotation marks omitted). Thus suits against state officials in their official capacity must be treated as suits against the State. Id. (internal citation omitted). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's 'policy or custom' must have played a part in the violation of federal law.'" Id. (internal citation omitted). "Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law." Id. Accordingly, to establish personal liability in a § 1983 action, a plaintiff need not establish a connection to governmental "policy or custom," as it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. Id. (internal citation omitted).

fact that Ruiz, as the Director of the Federal Programs at the Municipality, was the author of the letter and did nothing to stop the taking of Plaintiffs' pets despite being warned that the pet policy in place allowed pets. This leads us to find that whether Ruiz encouraged the unlawful seizure of Plaintiffs' pets is an issue that should proceed to trial.

    F. <u>Molina</u>

Molina is the Director of Emergency Management for the Municipality. (Docket No. 194 at 2). Molina went into one of the housing complexes on October 8, 2007 to execute the operation for the pick up of Plaintiffs' pets. (Docket No. 240-3, Exh. 10 at 2). Molina collaborated in directing the entire operation. (Docket No. 224-10, Exh. 8 at 36). Furthermore, Molina coordinated the pickup of Plaintiffs' pets, knocked on Plaintiffs' doors, and told them that they would be evicted if they did not surrender pets. (Docket No. 224-15, Exh. 13 at 19 & Docket No. 240-2, Exh. 9 at 2). These facts are sufficient to create a genuine issue whether Molina as a supervisor encouraged the unlawful seizure of Plaintiffs' pets. Furthermore, the evidence submitted by Plaintiffs has created a trial worthy issue whether Molina directly participated in the unlawful seizure of Plaintiffs' pets. Specifically, Plaintiffs submitted evidence that Molina not only knocked and talked to Plaintiffs but also coordinated the pick up of their dogs. Hence, Plaintiffs have shown that a trial worthy issue exist whether

Molina is liable as a supervisor for encouraging the unlawful constitutional conduct complained of by Plaintiffs and for his direct participation in such violations.

### G. Gonzalez

Gonzalez was the administrator of one of the housing complexes where Plaintiffs live. (Docket No. 194 at 4). Gonzalez was present while Plaintiffs' pets were taken from their residences. (Docket No. 224-28, Exh. 26 at 25-27, 36). During the operation, Gonzalez accompanied the employees of the Municipality among them Molina. (Id.).

Defendants II contend that summary judgment should be entered in Gonzalez's favor because she did not enter any of Plaintiffs' residences, threaten any of the Plaintiffs nor removed their pets. Plaintiffs oppose Defendants II's request for summary judgment and argue that those Defendants that entered and grabbed Plaintiffs' pets did so under the supervision of Gonzalez and Molina. Making all reasonable inferences in Plaintiffs' favor leads us to conclude that whether Gonzalez was a supervisor that encouraged, condoned, acquiesced or acted with gross negligence amounting to deliberate indifference is in genuine dispute. Accordingly, Plaintiffs' claims against Gonzalez must also proceed to trial.

### H. Riquelme

Riquelme was also the administrator of one of the housing complexes where Plaintiffs lived. (Docket No. 194 at 4). Riquelme

was present when the Plaintiffs' pets were taken and even ordered one of the Plaintiffs to turn in their pet. (Docket No. 224-19, Exh. 17 at 14-15). Defendants II contend that summary judgment should be entered in Riquelme's favor because she did not enter any of Plaintiffs' residences. Plaintiffs oppose such request. As in the case of Gonzalez, we find that after making all reasonable inferences in Plaintiffs' favor, there is a genuine dispute whether Gonzalez was a supervisor that encouraged, condoned, acquiesced, or acted with gross negligence amounting to deliberate indifference in violation of Plaintiffs' rights.

I. <u>Santiago</u>

Santiago actively participated in the removal of Plaintiffs' pets. (<u>See</u> Docket Nos. 224-18, Exh. 16 at 12; 224-14, Exh. 12; 214-56, Exh. 48 at 14). Defendants II have not submitted any evidence that Santiago did not remove their pets. Defendants did argue that Jessica Fuentes consented to the removal of her pet. That material fact, however, is in dispute, as Plaintiffs submitted evidence that Jessica Fuentes never consented to the removal of her pet. (Docket No. 224-18, Exh. 16 at 28). Since there is no other evidence submitted by Defendants II that would entitle Santiago to summary judgment on Plaintiffs' Fourth Amendment claims, this Court must deny Santiago's request for summary judgment.

J. <u>Supplemental Law Claims</u>

This Court should decline to exercise supplemental

Civil Case No. 07-1992 (JAG)                                    50

jurisdiction over a plaintiff's supplemental jurisdiction claims
when all federal claims are dismissed. See Camelio v. American
Federation, 137 F.3d 666, 672 (1st Cir. 1998) (holding that "the
balance of competing factors ordinarily will weigh strongly in
favor of declining jurisdiction over state law claims where the
foundational federal claims have been dismissed at an early stage
in the litigation") (internal citations omitted). All federal
claims proffered by the Twelve Plaintiff Families shall be
dismissed. As such, all state law claims submitted by the Twelve
Plaintiff Families must be dismissed.[12] All other supplemental state
law claims shall proceed to trial.

     K. <u>Injunction</u>

In the case at bar, Plaintiffs request that Defendants be
permanently enjoined from repeating their actions, i.e. the taking
and killing of pets in the housing complexes. The Magistrate Judge
recommended the denial of Plaintiffs' request for injunctive
relief. Plaintiffs object to the Magistrate Judge's conclusion that
their request for injunctive relief is moot.

It is settled law that in a federal court, justiciability
requires the existence of an actual case or controversy. <u>Goodwin v.</u>

---

[12] The fact that the Twelve Plaintiff Families' state law
claims have been dismissed does not mean that they have not
sufferred any damages as a result of Defendants' actions. Whether
the Twelve Plaintiff Families suffered damages under state law
should be decided by the state courts.

C.N.J., Inc., 436 F.3d 44, 48 (1st Cir. 2006). The "case and controversy" requirement persists at all stages of the litigation. Id. Accordingly when events take place that make it impossible for the court to provide effective relief, the matter is no longer justiciable and must therefore be dismissed as moot. Id. (internal citation omitted); Oakville Dev. Corp. v. Federal Deposit Ins. Corp., 986 F.2d 611, 613 (1st Cir. 1993). A federal court may not grant injunctive relief when "intervening events have eliminated any reasonable anticipation that the aggrieved party will, in the future, be faced with a recurrence of the alleged harm." Goodwin, 436 F.3d at 49 (internal citations omitted).

Defendants argue that Plaintiffs' request for injunctive relief is moot because the Municipality no longer administers the housing complexes. Plaintiffs on the other hand submit that Ordinance No. 33, which contains a categorical prohibition of pets in pubic housing communities in the Municipality, is still in effect. According to Plaintiffs, the fact that Ordinance No. 33 can be enforced makes Defendants' actions "capable of repetition, yet evading review."

Plaintiffs' asseveration that the Defendants' actions are "capable of repetition, yet evading review" fastens upon a recognized exception to general principles of mootness. Id. at 615. "[T]he exception applies only if there is a reasonable expectation or a demonstrated probability that the same controversy will recur

involving the same complaining party." Id. (internal citations and quotation marks omitted). Plaintiffs' case does not fall within this exception.

First, the fact that the Municipality no longer administers the housing complexes is an intervening event that eliminates any reasonable anticipation that in the future, the Municipality will, as alleged by Plaintiffs, mobilize the other Defendants to commit the harms alleged in the case at bar. Second, the Municipality is aware that the 2007 Pet Policy allows public housing residents to have pets. We find it highly unlikely that the Municipality would repeat the actions that occurred in October 2007. More than two years have passed since the events complained of by Plaintiffs took place. Plaintiffs have not submitted any claims in those two years that deal with Defendants engaging again in the taking of pets from the residents of the public housing complexes in Barceloneta. Consequently, this Court holds that Plaintiffs have failed to show that they will suffer this fate anew. Accordingly, Plaintiffs' request for a permanent injunction is denied as moot.

**CONCLUSION**

For the reasons stated above, the Court hereby **ADOPTS** in part and **REJECTS** in part the Magistrate Judge's Report and Recommendation. (Docket No. 262). Defendants I's motion for summary judgment, (Docket No. 182), is **GRANTED** in part and **DENIED** in part.

Civil Case No. 07-1992 (JAG)                                    53

Defendants II's motion, (Docket No. 197), is **DENIED.** The Twelve Plaintiff Families' federal claims shall be dismissed with prejudice. The Twelve Plaintiff Families' state law claims shall be dismissed without prejudice. All other supplemental state law claims shall proceed to trial. Partial Judgment shall be entered accordingly. Furthermore, the Court denies Plaintiffs' request for injunctive relief.

        IT IS SO ORDERED.

        In San Juan, Puerto Rico, this 19th day of January, 2010.


                              S/Jay A. Garcia-Gregory
                              JAY A. GARCIA-GREGORY
                              United States District Judge